WILLIAM H. WILLIAMS, Plaintiff, *v.* JOHN F. HYLAN, as Mayor of the City of New York, and Others, Defendants.

Supreme Court, New York County, March 31, 1926.

Municipal corporations — parks — taxpayer's action to enjoin lessee of space in Battery Park, New York city, from erecting refreshment stands and to restrain commissioner of parks from proceeding under agreement — public parks can be used only for legitimate park purposes — agreement in question is lease and not mere license — alienation of parks is prohibited by Greater New York charter, § 71 — said provision applies to lease for ten years — temporary injunction granted.

An injunction *pendente lite* will be granted in a taxpayer's action to restrain the lessee of space in Battery Park, New York city, from erecting substantial refreshment stands and to restrain the commissioner of parks of said city from acting and proceeding under the agreement with said lessee, since it appears that the law requires that public parks shall be used only for legitimate park purposes, and that the agreement which gives the lessee the exclusive possession of certain portions of Battery Park is a lease and not a mere license, notwithstanding that it contains a provision for revocation, and notwithstanding also that it provides that the commissioner of parks may regulate the business of the lessee and may determine the fairness of prices charged by him.

Section 71 of the Greater New York charter prohibiting the alienation of parks applies to a ten-year lease, and while such a lease may not be void, if it carries out public purposes authorized by the charter, still, operation thereunder may be enjoined, where it appears that there are many refreshment stands in the immediate vicinity of Battery Park; that other stands are not required; that the rental is exceedingly low; that the arrangement was apparently made for the express purpose of enabling the lessee to make a profit, and that the stands will very materially interfere with the rights of children in the park.

MOTION for an injunction *pendente lite* in a taxpayer's action.

*Bandler & Roulstone* [*William Bradford Roulstone* of counsel], for the motion.

*George P. Nicholson, Corporation Counsel* [*Josiah S. Stover* of counsel], opposed.

*Bandler, Haas & Collins* [*John F. Collins* of counsel], opposed.

LEVY, J. This is a motion for an injunction *pendente lite* in a taxpayer's action brought to enjoin the defendant Antonopulos from erecting and maintaining two stands for the sale of refreshments, under an agreement made by him with the commissioner of parks for the borough of Manhattan, and to restrain the latter from acting and proceeding under such agreement. It appears that on October 15, 1925, this writing was entered into, by the terms of which the defendant Antonopulos received what is

Supreme Court, March, 1926. [Vol. 126

characterized as a " license " to maintain and erect two stands in Battery Park, borough of Manhattan, one outside the barge office and the other at the westerly end of the elevated railroad steps, for the sale of refreshments. The exact location of these is specified on a blueprint attached. The agreement recites that it is made " in order to promote the comfort and provide for the convenience of the public." Under the terms of the license, Antonopulos agrees to pay an annual rental of $4,000; to erect the stands at his own expense; to keep them in a clean and sanitary condition; to make no changes therein without the consent of the commissioner, and to comply with all rules and regulations of the various public departments. In order to avoid possible exorbitant charges the price lists of the articles to be sold are to be subject to the approval of the commissioner. The term granted is for a period of ten years, but if the city should require the property for public purposes, it is terminable upon six months' notice. At the end of the tenure the buildings erected are to belong to the city, but if the license should be terminated upon notice, the licensee is to remove them at his cost. The stands are admittedly substantial and permanent structures involving a possible outlay of $25,000.

The agreement is attacked as illegal on the principal ground that it is *ultra vires* in so far as the right of the park commissioner to enter into it is concerned. The powers of this officer are determined by section 612 of the Greater New York charter (as amd. by Laws of 1908, chap. 135), which provides, in part, as follows: " It shall be the duty of each commissioner * * * to maintain the beauty and utility of all such parks, squares and public places as are situated within his jurisdiction, and to institute and execute all measures for the improvement thereof for ornamental purposes and for the beneficial uses of the people of the city." Under this section the commissioner, quite obviously, is in duty bound to maintain the park for the objects for which the law intended it. The general purposes of such a public space are tersely but appropriately stated as follows: " A park is, in its strict sense, a piece of ground inclosed for purposes of pleasure, exercise, amusement or ornament." (*Perrin* v. *N. Y. Cent. R. R. Co.*, 36 N. Y. 120, 124.) The statute defining the duties of the commissioner seemingly recognizes that the proper use of the park results from its æsthetic features and from the recreational facilities it provides for the promotion of the health and enjoyment of the citizens. It follows, therefore, that no objects, however worthy, such as courthouses, schoolhouses and other educational structures, fit within the scheme of park purposes, unless such uses are expressly permitted by legislative authority. (*Williams* v. *Gallatin*, 229 N. Y. 248.) As is further

observed in that case (at p. 253): "Monuments and buildings of architectural pretension which attract the eye and divert the mind of the visitor; floral and horticultural displays, zoological gardens, playing grounds, and even restaurants and rest houses and many other common incidents of a pleasure ground contribute to the use and enjoyment of the park." Buildings which may be of architectural pretensions, but which are utilitarian beyond the scope of park purposes, will, therefore, not be permitted. The erection and maintenance of the structures within the park, no matter how ornamental, could be justified only on the ground that they actually serve park purposes. The proposed buildings cannot be justified on the mere ground that they are artistic. If they serve an ulterior aim, this may be examined, in order to determine whether such purpose is public or private, and if public, whether it is an appropriate park use justified by law.

The granting by the commissioner of a lease, even though in the interests of the public good, is prohibited if such purpose is not within the limits prescribed by law. Thus, the lease of a part of the Central Park arsenal for a museum of public safety, beneficently intended to advance the knowledge of the people in methods of lessening accidents, was held illegal (*Williams* v. *Gallatin, supra*), notwithstanding the laudable public objects of such an institution and its organization on a non-profit basis. But it may be that revocable licenses or permits are not construed as strictly as leases. Even such licenses, however, if they are for private purposes and do not promote a park use, may be said to be illegal. In *Tompkins* v. *Pallas* (47 Misc. 309) the court enjoined the use, for private advertising purposes, of a fence surrounding a portion of Bryant Park during the period of erection of the New York Public Library. This injunction was allowed, notwithstanding the grant of the privilege by the commissioner on a substantial rental arrangement. As the law, for obvious reasons, will look more carefully into the objects of a lease than into those involved in a revocable license, it becomes important to determine whether the instrument in question is a lease or a mere permit.

The term which is applied to the document by the parties themselves does not necessarily determine the nature of the grant. The observation of the Court of Appeals in *Greenwood Lake, etc., R. R. Co.* v. *New York, etc., R. R. Co.* (134 N. Y. 435, 439) is directly in point: "While the instrument creating the right is termed in the body thereof, a 'license to use said railroad,' this is not conclusive for the court must look at the nature of the right rather than to the name that the parties gave it, in order to learn its true character." If the instrument purports to yield up exclusive

possession of premises against the world, including the owner, it is not a license, but creates an irrevocable estate or interest in the land. (*City of Berwyn* v. *Berglund*, 255 Ill. 498.) Such exclusive possession is certainly given to the licensee, so called, by this agreement. It is perfectly true that it contains a cancellation clause, but so do many leases in commercial and other realty situations. This clause is, in fact, even narrower than the usual proviso, in assuring to the city the right to annul upon six months' notice, and only upon the contingency that the property is required for " any public purpose." In *Mehlman* v. *Atlantic Amusement Co.* (65 Misc. 25) the defendant let to the plaintiff the right to maintain at Steeplechase Park, Coney Island, three stands for the sale of candies, one of which was to be located in the main pavilion of the park, and also the storeroom under the steeplechase tracks. The period of the grant was for the summer season of the year 1907. In construing this contract the court said:· " While it is true that the mere use of the words ' lease ' and ' let ' in the contract does not necessarily create a lease, as distinguished from a license, nevertheless, the instrument in suit must be regarded as a lease, since it gave plaintiff a right to the possession and use not only of a certain specified space of ground for his stands, but also of the storeroom under the tracks, which right of use and possession certainly affected defendant's right to the exclusive use of its land."

The right of the grantee here is none the less exclusive, because it gives the commissioner the power to prescribe regulations for the use of the property. Even the case of *Gushee* v. *City of New York* (42 App. Div. 37), which involved a contract for the privilege of conducting the Claremont Restaurant in Riverside Park, declared the instrument to be a lease, notwithstanding the right of the commissioner to cancel, in the event he determined in good faith to discontinue the use of the property for restaurant purposes, and notwithstanding the other rules, regulations and ordinances to which the privilege was subject. The court there said (at p. 40): " This agreement, involving, as it did, the possession of real estate and the payment of a monthly rent for it, was practically a lease." Hence, the instrument we are considering may indeed be said to be a lease and not a mere license, and the question, then, is whether such a lease can be lawfully granted. While the five-year lease on the Claremont Restaurant in the *Gushee* case was pronounced valid, that determination is not decisive here, because, among other reasons hereafter considered, it involved a grant executed in the year 1897 and prior to the time when section 71 of the Greater New York charter became effective. This section,

in effect January 1, 1898, provides as follows: " The rights of the city in and to its water fronts, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable."

Does this restriction upon the right of alienation apply to leases? The term " alienate " in its general sense, of course, implies the passing of title. Accordingly, in construing fire insurance provisos, the courts have deemed leases and contracts to sell the property insured as not violative of the alienation clauses. But, in interpreting the provisions of the charter, it would seem necessary to limit the sense of the word, otherwise the very restrictive purpose of the statute may be defeated; as for example, the grant of a long term lease, perhaps for ninety-nine years, which for all practical purposes might be tantamount to an actual sale. In the spirit indicated, constitutional provisions prohibiting the alienation of a homestead without the joint consent of husband and wife, have been held to apply to leases for a term of years. (*Coughlin* v. *Coughlin*, 26 Kans. 116; *Mailhot* v. *Turner*, 157 Mich. 167.) A similar inference may well be drawn from the opinion of the Court of Appeals in *City of New York* v. *Delaware, Lackawanna & Western R. R. Co.* (237 N. Y. 398), in which the city attempted to take certain wharfage rights from private owners without compensation, on the theory that the grant was originally illegal because of section 71, *supra.* The court denied the city's contention, for the reason that section 822 of the Greater New York charter (as amd. by Laws of 1915, chap. 597) was held to be a qualification of the sweeping prohibition contained in section 71, as it specifically empowered the city " to agree, license and permit private owners of any bulkheads, piers or water rights, to make the necessary improvements upon their bulkheads, piers or water rights, so as to conform to the plan already adopted by the department of docks,  *  *  *  during the period which shall intervene prior to the extinguishment of such private ownership by the city of New York,  *  *  *  upon such reasonable terms as to reimbursing said private owners for such improvements, and as to wharfage and other riparian rights thereon and therefrom, as may be agreed upon." The city was, therefore, clearly authorized to license and permit private owners to do certain things upon city property, and the power of the city to do so was upheld, not because this was not an alienation under section 71, but because it was particularly empowered to convey certain definite easements, permits and licenses under the very section 822. That decision would appear to indicate that " alienation " as applied to city property is to be construed, therefore, not in the absolute sense of full

conveyance but in a much more restricted form. Consequently, a lease for ten years as such, of property of the kind involved here, would seem to come within the ban of section 71. On the other hand, the decision mentioned further points out that this provision must be read in the light of express or implied relaxations of the strict rule as contained in other sections of statute law. Thus viewed, it cannot be accurately said that a lease of the public property specified in section 71 is void, if it necessarily carries out a public purpose authorized in any other section. Whether it effects such a purpose in the situation before us now remains to be seen.

The use of the parks for recreation implies certain essential concomitants, including refreshment service. It cannot be presumed that the city will go into the restaurant business in order to provide this. The letting of such privileges to concessionaries, in proper cases, undoubtedly promotes the public use of the parks. And it is not unreasonable to anticipate that the person so privileged will financially profit by his efforts. On the other hand, an attempted concession in the form of a long lease, in derogation of the restriction in section 71 of the Greater New York charter, requires a strict examination of its effect upon public rights and a clear justification of the authority of the commissioner to make it, based on the ground that it improves the facilities for better park use. Such an examination by the court is not an interference with the discretion of the commissioner, but fully within the prerogatives of the judicial branch of government. As is said in *Matter of Niagara Falls, etc., Co.* (108 N. Y. 375, 383): " The general principle is now well settled that when the uses are in fact public, the necessity or expediency of taking private property for such uses by the exercise of the power of eminent domain, the instrumentalities to be used and the extent to which such right shall be delegated are questions appertaining to the political and legislative branches of the government, while on the other hand the question whether the uses are in fact public, so as to justify the taking *in invitum* of private property therefor, is a judicial question to be determined by the courts."

The fact that the lease provides that it is intended to promote the comfort and convenience of the public is not decisive. " The determination of these questions is a judicial one belonging to the courts. The fact that the act declares in words that it is a public act, or even that the taking is for a public use, is not conclusive." (*Queens Terminal Co. v. Schmuck,* 147 App. Div. 502, 504.)

What are the facts in the case bearing upon this point? Battery Park is one of the group of small parks of the city, situated at the southerly tip of Manhattan island, and covering an area of twenty-

one acres. Its limited surface is already encroached upon by several structures erected possibly at a time when public opinion was not so jealous of such encroachments upon the city's recreational centers. The streets contiguous to it contain more than twenty stores selling the same class of merchandise as the lessee proposes to vend, thus giving rise to a form of competition against which the property owners in the vicinity seemingly justly protest. In the park itself there are a number of portable booths erected by the city and let out to licensees. As a consequence, it would appear that means for refreshment are now amply provided for, and no impelling reason is shown why it is necessary to furnish additional facilities, especially by the erection of permanent structures in a small park apparently already overcrowded. In any event, if there were any doubt it would seem to be largely dispelled by a study of the terms of the lease and the rent therein reserved.

An inquiry into the adequacy of the consideration to be paid by the lessee is pertinent on the question of whether the concession is primarily intended to advance the private financial interests of the defendant Antonopulos or to really promote the public good. As already adverted to, a concession is not necessarily illegal, because the licensee profits by it, but when the rental appears proportionately much lower than similar space in the neighborhood commands the inference may be justified that the paramount effect of the lease is the private gain of the lessee. As against the sum of $4,000 annual rental in this agreement provided for, it is urged that private space of a like character commands $20,000 a year. I am not impressed with the contention that in measuring the fairness of the rental of $4,000 due regard should be had to the fact that at the expiration of the lease the buildings revert to the city. If they are not architectural monuments *per se*, their continued use as refreshment stands may, at the termination of the period of ten years, so outgrow the purpose of the park as to require their removal. So little are the parties themselves impressed with the intrinsic value of the buildings that in the 18th paragraph of the lease they provide for their removal by the " licensee " in the event that the space occupied by him is required for any public purpose. Presumably, upon the happening of that contingency, the buildings would belong to such licensee.

Nor is there much force in the reasoning that there is no comparison between the rental value of space in the park and such value of a store in a building without the park, the argument implying that the latter would be much higher. On the contrary, the seeming strategic location of the proposed park structures and their alleged attractiveness and ornamentation might probably

make them far more desirable from a commercial point of view than a store in a building privately owned. The possible contention that the lower rental redounds to the benefit of the consumers by the more reasonable charges for food and other articles resulting therefrom is not supported by the evidence. While the agreement reserves to the commissioner the right to pass upon prices, to avoid " exorbitant " charges, it is scarcely within the intent of the instrument to effect a material saving to the consuming public, a saving which incidentally might enable the defendant Antonopulos to undersell his neighboring tradesmen and force them out of business, with consequent material gain to himself.

In arguing upon the necessity of a long lease in order to justify the large expenditures by the lessee, as required of him under the contract, the defendants are begging the question. It is perfectly clear that they must first justify the public necessity for permanent structures before they can attempt to defend the length of the term. Having failed to do so, their contention necessarily falls to the ground. The *Gushee* case, here referred to, certainly does not avail the defendants. Aside from the fact already mentioned, that the decision there involves a situation which arose prior to the passage of section 71 of the Greater New York charter, there are other convincing reasons why it is not controlling. The location of the Claremont Restaurant in a then sparsely settled location of the city, its availability for the comfort of pleasure travelers in horse-drawn vehicles before the days of the automobile, the probable general change of the public attitude toward encroachments on the uses of the parks as voiced by our Court of Appeals in *Williams* v. *Gallatin* (*supra*) — all point to a situation radically different from that which obtains here. Assuredly, there is no parallel between a restaurant in a building *already located* in a section distant from other refreshment places, and one *to be erected* in a location already well provided with such means.

There appears no need of entering upon an extended observation in respect to the claim that the grant of Battery Park to the city of New York for park purposes exclusively impressed the city's title with a trust to use the park for such purpose and no other. This argument upon the circumscribed powers of the city by reason of the restriction in the grant, while very cogent indeed, is comprehended in the larger issue that the charter allows *no* park property to be utilized otherwise than for public objects.

A serious question has also been raised by the plaintiff as to the effect upon the playground activities of the children of the community by the erection of the proposed buildings. Difficulties are suggested by reason of the fact that unrestricted play might result

in damage to the lessee's property, with the possible necessity of restricting the freedom of movement of the children.　The rights of the latter to the use of their playground are unquestionably paramount to those of the owner of the place of refreshment, especially so in the present instance.　While the probable effects referred to can best be adequately determined only at the trial of the action, the mere possibility of such an eventuality is a ground for positive hesitation in permitting the lessee to continue under his agreement.　It may be, however, that ostensibly he has proceeded in good faith with his structures, and that the injunction may cause him considerable injury.　But he has no reason for complaint on that score　He is presumed to have known the limitations upon the powers of the commissioner when he entered upon the lease.　As Dillon says in his work on Municipal Corporations (5th ed. vol. 2, p. 1153):　" Public officers or agents are held more strictly within their prescribed powers than private general agents; and a contract made by a public agent within the apparent scope of his powers does not, if there be no estoppel, bind his principal in the absence of actual authority."

It may also be that upon the trial facts and circumstances may appear which will show that the concession tends to serve a public necessity and that its terms are perhaps just and fair.　But the evidence as disclosed by the affidavits, as I apprehend, negatives any such inference.　In fact, it gives forth the impression that the guardians of the city's interests have attempted to alienate or barter away the birthright of the citizens in their public park for a mess of pottage.　Certain it is, indeed, that the multiplicity of this sort of structure within a given park cannot be said to be conducive to the æsthetic beauty or utility of such park, at any rate from a landscape point of view.　Our parks, as I have come to feel, are already too full of artificial incumbrances and resulting litter, and those who appreciating their civic responsibilities stand guard zealously to preserve the people's rights in a matter so vital to the public health and comfort, deserve high commendation.

Under the circumstances, I must grant the motion for a temporary injunction.　Settle order.