James J. Tobin, Plaintiff, *v.* Joseph P. Hennessy, as Commissioner of Parks of the Borough of The Bronx, and The City of New York, Defendants.*

Supreme Court, Bronx County, May 4, 1927.

**Municipal corporations — parks — taxpayer's action to restrain commissioner of parks of The Bronx from issuing licenses for use of shore front of Pelham Bay Park for residential purposes — use of land in such manner is not for park purposes — park commissioner cannot permit even temporary use of park for other than park purposes — injunction pendente lite granted.**

This is a taxpayer's action to restrain the commissioner of parks of the borough of The Bronx from issuing licenses for the use of the shore front of Pelham Bay Park for residential purposes. It appears that the section constitutes a village of 2,000 to 3,000 persons who occupy bungalows for summer homes under licenses granted by the commissioner. This use of Pelham Bay Park is not for a park purpose. The fact that the licenses are limited for a portion of the year is of no avail to defendant, since the commissioner cannot permit even temporary use of any park within his jurisdiction for other than park purposes. An injunction *pendente lite* is granted.

Motion for an injunction *pendente lite* in a taxpayer's action to enjoin the commissioner of parks of the borough of The Bronx from giving license or permission for the use of the shore front of Pelham Bay Park for residential purposes.

*Hyman & Hyman* [*Sol. A. Hyman* of counsel], for the plaintiff.

*George P. Nicholson, Corporation Counsel* [*William E. C. Mayer* of counsel], for the defendants.

Mitchell, J. It appears that some ten years ago the department of parks of the borough of The Bronx issued some licenses

---

* Modified, 220 App. Div. 695.

or permits to certain individuals authorizing them to build camps or bungalows for summer residences, extending along the shore front of Pelham Bay Park known as Orchard Beach. This bungalow colony has grown until now 650 bungalows or camps extend from the City Island bridge along the shore front and from 2,000 to 3,000 people live there each summer from year to year in their own bungalows, many of them for many years. Within the last two years the entire road along the shore and in front of the village of bungalows has been reconstructed and rebuilt with moneys appropriated by the city to the extent of $140,000. There is no claim whatever that this large area is being used for any public purpose or for any purpose in any way even remotely connected with park purposes. The entire section of the park constitutes a village of from 2,000 to 3,000 people to whom the department of parks is issuing from year to year permits to occupy Pelham Bay Park for their summer homes. Some of them have installed electric lights and telephones, but of course, none of our public parks is sewered for residence purposes and consequently, outhouses and toilets have been erected back of the bungalows with no sewer connection. One of the affidavits states, and it is not denied, that these toilets are emptied three times a week by the park department. Many of the residents have automobiles and a space has been provided in front of the bungalows, between the road and the beach, where these vehicles are parked day and night during the summer.

In the affidavits submitted by the corporation counsel no claim is made that this village development of summer bungalows for a small group of selected private families, under the jurisdiction of the park commissioner, is a park purpose or in any way benefits the citizens at large. The affidavits of the park employees and four of the bungalow owners are submitted in attempted justification of this use of one of our parks, upon the ground that this section consists of " undeveloped park lands " and that its use is temporary.

The landscape architect of the park board of the city of New York says that to improve said lands and utilize them as a public park would require $250,000 as a minimum for the simplest kind of a park improvement and in the case of a complete and finished park improvement upwards of $1,000,000 would be required; that Pelham Bay Park has not yet been improved as a public park for the uses and purposes to which a public park would be put, and such improvement would cost upwards of $10,000,000. Of course, the conclusion attempted to be drawn therefrom, that the park commissioner is, therefore, justified in permitting the use of this public park property for private residence purposes,

is plainly a *non sequitur*. The affidavit of another employee in the park department hints at the truth, that just as it is, it is largely enjoyed and appreciated by the people, when he says of the road constructed by the department, " it is used by the public at large and on Sundays in the spring, summer and fall thousands of automobiles pass through and over the road."

The law is that park property must be preserved for park purposes, even though the landscape architect never gets the $10,000,000 to improve it. Pelham Bay Park is one of the beauty spots of our city, made so by God without the use of city money, and should be kept free and open for the unrestricted use of all the people. Section 612 of the Greater New York charter provides that each commissioner shall have charge of the management and be responsible for the care of the parks situated in the borough over which he has jurisdiction, and it is his duty to maintain the beauty and utility of all such parks and institute and execute all measures for the improvement thereof for ornamental purposes and for the beneficial uses of the people of the city.

The four photographs annexed to the moving papers, numbered 10, 11, 13 and 14, show the appearance of this once beautiful shore front as it now exists from October to May. Photograph numbered 12 shows the extent of the water front, commencing at City Island bridge, now occupied by this bungalow village. Certainly the time of the park employees cannot be properly occupied in supervising and managing such a group of homes.

But it is claimed in defense of the continuance of this situation that it is only temporary. It is well known that any private use of park property, or its use for commercial purposes, is directly forbidden if such use is more than temporary. Hence the subterfuge of temporary permits to circumvent the law. So in this case there have been issued permits running from June until the middle of September in each year. This covers the summer, after which these selected residents of the public park return to their winter homes. Then another permit is issued, which runs from September to June of the following year, thus covering the full twelve months. In the spring, about May, new permits are issued covering another year. But the law says that what is forbidden directly cannot be legally done indirectly. Many of these bungalow owners have resided in Pelham Bay Park for years. This will be seen even from the four affidavits submitted by the park department. La Rocca states he has had his bungalow there five years. Flynn has had his for five years. Rathe has had his for four years, and Jerry Golino, for four years. It was a cruel chance that led the counsel for the city to select Jerry Golino's from among the summer cottages

in Pelham Bay Park as one of those who asks that the situation continue, on the ground that the park department has conducted everything nicely and to his entire satisfaction. He is one of a number of park residents who combines a little business with his summer outing. He advertised his bungalow for sale last summer, and one of the affidavits annexed to the moving papers relates the conversation had with him. He offered to sell his bungalow for $1,100 and stated that the purchaser would have no difficulty in having his permit transferred, although permits by outside parties were very hard to obtain and that he knew of some people paying as high as $200 just to secure the permit. This was not an isolated case. There appeared in a newspaper, with a circulation of over 100,000 copies in The Bronx, advertisements of camps for sale in this park development at Orchard Beach to a large number. Sixty-six of these advertisements during June and July, 1926, are set forth in full in the moving papers. Another bungalow, which could be purchased for $600, actually had a sign on it " For Sale."

The jurisdiction of the park department over the parks of the city has frequently been the subject of judicial inquiry. In *Tompkins* v. *Pallas* (47 Misc. 309) a license to place advertising on the fence surrounding Bryant Park during the construction of the public library was declared to be illegal, and the fact that the city derived a revenue therefrom was held immaterial, since the parks are not intended as revenue producing property. In *Kurtz* v. *Clausen* (38 Misc. 105) a permit by the commissioner of parks to one Spate, by which he was allowed to place chairs in the parks and make a charge for their use, was enjoined. The latest expression of the Court of Appeals is found in *Williams* v. *Gallatin* (229 N. Y. 248). The use of a building in Central Park by the Safety Institute of America was enjoined upon the ground that such use of the building was not for a park purpose. POUND, J., said: " The legislative will is that Central Park should be kept open as a public park ought to be and not be turned over by the commissioner of parks to other uses. It must be kept free from intrusion of every kind which would interfere in any degree with its complete use for this end." This rule should be followed in the conduct and management of all our parks.

In *Williams* v. *Hylan* (126 Misc. 807) Mr. Justice LEVY in an able opinion rejected the specious arguments of one of these privileged licensees, and granted an injunction, even though a substantial amount of money had been already expended. In the present case it is fortunate that the matter is presented before the renewals of licenses have been issued for the coming year and

Surrogate's Court, New York County, April, 1927.     [Vol. 129

before any purchaser shall have paid $1,100 for Jerry Golino's bungalow.

The preliminary objection, relating to the failure of the plaintiff to file the bond required by statute, was withdrawn. The bond has since been approved and filed.

Under the circumstances disclosed by the papers submitted I must grant the motion for a temporary injunction. Settle order.