WILLIAM H. WILLIAMS, Appellant, v. JOHN F. HYLAN, as Mayor of the City of New York, and Others, Respondents.*

First Department, March 2, 1928.

Municipal corporations — parks — action to restrain erection, use and occupation of two buildings being erected in Battery Park, New York city — one of defendants was given ten-year lease or permit by park commissioner to erect two buildings with area of 2,052 square feet — buildings were to be used for sale of candy, cigars, etc.— annual rental reserved was $4,000 for term of ten years — instrument contained stipulation for cancellation if property was required for " any public purpose "— instrument construed as lease and execution violated Greater New York Charter, § 71 — if instrument were construed as revocable license commissioner abused discretion in granting such license.

The park commissioner of the city of New York granted a ten-year lease or permit at an annual rental of $4,000 to one of the individual defendants to erect at Battery Park two buildings for the sale of candy, cigars, etc., the proposed buildings to occupy an area of approximately 2,052 square feet. The lease or permit contained a stipulation for cancellation if the city should require the property for " any public purpose." The buildings in the location will not serve the park but only the passing public and furthermore there are enough refreshment stands in and about the park to satisfy all requirements. The evidence tends to show that the lease or permit was granted apparently because the park commissioner felt that it was the desire of the then mayor that the property be leased to the individual defendant. It also appears that the rental of $4,000 per year is about one-fifth of the rental of similar property in that locality.

The instrument although called a permit has every element of a lease for ten years and its execution violates section 71 of the Greater New York Charter which prohibits the alienation of the property of the city.

The fact that the instrument provides that it is intended to promote the comfort and convenience of the public is not conclusive upon the court.

Furthermore, the very terms of the instrument itself indicate that it was not given for a public purpose or public use since it contained a clause for cancellation if the property should be required " for any public purpose."

If the instrument could be construed as a revocable license the granting of the same was a great abuse of discretion by the park commissioner.

PROSKAUER and O'MALLEY, JJ., dissent, with opinion.

* Revg. *sub nom. Williams* v. *City of New York* (129 Misc. 654); affd., 248 N. Y. 616.

APPEAL by the plaintiff from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 27th day of May, 1927.

*William Bradford Roulstone* of counsel [*Joseph Kahn* with him on the brief; *Bandler & Roulstone*, attorneys], for the appellant.

*Vine H.. Smith* of counsel [*Josiah A. Stover* and *J. Joseph Lilly* with him on the brief; *George P. Nicholson, Corporation Counsel*], for the respondents John F. Hylan, as mayor, etc., Francis D. Gallatin, as commissioner, etc., and the City of New York.

*Edmund L. Mooney* of counsel [*Wilber W. Chambers* with him on the brief; *Bandler, Haas & Collins*, attorneys], for the respondent John D. Antonopulos.

MARTIN, J. The plaintiff, William H. Williams, a citizen and taxpayer of the city of New York, instituted this action under section 51 of the General Municipal Law on December 30, 1925, to restrain the erection, use and occupation of two buildings then being erected in Battery Park by the defendant John D. Antonopulos under the terms of a ten-year lease or permit, granted to Antonopulos by the park commissioner.

An order restraining the erection, use and occupancy of the said buildings was granted on April 28, 1926. (See *Williams* v. *Hylan,* 126 Misc. 807.) On appeal the order was affirmed. (217 App. Div. 727.) The action then proceeded to trial. A judgment vacating the injunction and dismissing the complaint was granted by the trial court, which judgment is dated May 27, 1927. The lease or permit granted herein was entered into on the 15th day of October, 1925. By its terms the defendant Antonopulos received what is characterized by the defendants as a license to erect and maintain for the sale of candy, cigars and as a luncheonette, two buildings in Battery Park, borough of Manhattan. One of the buildings is opposite the Barge Office and the other is near the end of the elevated railway, facing the entrance to the station. The buildings occupy an area of about 2,052 square feet.

The agreement recites that it is made in order to promote the comfort and provide for the convenience of the public. It requires the defendant Antonopulos to pay an annual rental of $4,000 for a term of ten years. It permits him to erect the buildings on park property; requires him to keep them in a clean and sanitary condition; to make no changes therein without the consent of the commissioner and to comply with all the rules and regulations of the various public departments. The prices of the articles to be sold are to be subject to the approval of the commissioner. While

the term granted is for a period of ten years, if the city should require the property for " *any public purpose*," previous to the expiration of the lease, it is terminable upon six months' notice. At the end of the term the building serected are to become the property of the city, but if the lease should be terminated upon notice, the lessee is permitted to remove the buildings at his own cost.

The park commissioner testified that on or about the 1st day of October, 1925, he received a telephone call from the executive secretary to the then mayor requesting that he consider the application for a concession by the defendant Antonopulos for the erection of the two structures in Battery Park, and that the mayor was interested. The commissioner replied that he would look into the matter and report. Mr. Antonopulos then visited the office of the commissioner and pointed out the approximate location of the proposed buildings. Without waiting for the commissioner to act, he selected the location and made the application for the lease. The commissioner was dissatisfied with the offer of rental, which was $1,200 per year for each building, but he says he felt the city would be compensated by the fact that the buildings to be erected were to be artistic and would be designed by the best architects. His expectation was not fulfilled. Plans made by a builder were then submitted to the commissioner, who decided that they were not artistic, and recommended the employment of a Mr. Thomas as architect.

The commissioner then asked the landscape architect of the park department to examine the location and report to him as to the advisability of granting the permit. The landscape architect wrote to the commissioner stating that he had examined the plans for the buildings and did not find them objectionable from a landscape point of view, if the erection of such buildings be deemed advisable in the interest of the public. He clearly avoided the responsibility of reporting favorably on the advisability of granting the permit.

The landscape architect on both direct and cross-examination said that he had never given his statutory assent; did not approve the plans, and only intended the commissioner to act upon his letter if he deemed it necessary to introduce these buildings into the park. He testified that he not only did not approve the plans, but did not put his signature thereon, and did not give his assent as required by the statute. (Greater N. Y. Charter [Laws of 1901, chap. 466], § 611.)

The park commissioner was evidently not very much impressed with this application, for he testified that the reason he approved the structures was that the section was very ugly and could not

be utilized for any *useful park purpose*, in effect admitting that this was not a useful park purpose, and overlooking the fact that a screen of shrubbery had to be removed to construct these buildings. He testified that he knew there were already five refreshment stands in Battery Park, together with two on the water front under the jurisdiction of the dock department, but *he did not know* whether they provided an adequate amount of accommodations for park users.   One reason he gave for allowing these buildings to be constructed in the park was that the needs *might develop and there might be* occasion to use them; that while the buildings had no entrance in the park (the only entrance being from the sidewalk bordering the park), a great deal of human traffic passed by, and the buildings were intended to serve these passersby.

It is evident that the valuable site for these buildings was selected, not by the commissioner, but by Mr. Antonopulos, and that they were stretched along the front of Battery Park for over 100 feet to catch the trade coming from the various railroad and subway stations and ferries.   The whole scheme is simply a good business proposition for the lessee.

The testimony shows that there is at all times heavy vehicular traffic on the road through Battery Park to the Staten Island ferries. When a ferry boat is at the dock, the vehicles move; when no boat is in the slip, the line of vehicles stationed on the road adjacent to the proposed location of these buildings, cuts off the main part of the park from that section.   People who are in the center of the park, which is already provided with abundant refreshment facilities, desiring to make purchases must cross the path of the heavy traffic to reach the stands to be constructed under this lease.   On the other hand, there is an outpouring of humanity from the elevated and subway stations and ferries, so that practically all of the public to be served by the proposed structures would come from sections outside the park.   There are already twenty-two cigar and candy stores and lunch rooms in and adjoining the park selling the same kind of articles the defendant Antonopulos intended to sell.   Near this small area, isolated from the rest of the park, there is also a children's playground.

Considerable testimony was introduced to show that the park is ruined from a landscape point of view by the elevated structures, subway entrances, etc., and that the proposed buildings could, therefore, do no additional harm.   Of course, that is not a valid reason for granting the lease.   On the other hand, there is testimony by plaintiff's witnesses that this section of the park would lend itself properly to landscape design and was much more sightly when covered with shrubbery.

It is also asserted that this permit or lease was granted to the defendant for an inadequate consideration, without any appraisal, without public advertisement and without competitive bidding. These are very important features as pointed out by the Special Term in this case (126 Misc. 807, 813) where it was said: "An inquiry into the adequacy of the consideration to be paid by the lessee is pertinent on the question of whether the concession is primarily intended to advance the private financial interests of the defendant Antonopulos or to really promote the public good. As already adverted to, a concession is not necessarily illegal, because the licensee profits by it, but when the rental appears proportionately much lower than similar space in the neighborhood commands the inference may be justified that the paramount effect of the lease is the private gain of the lessee. As against the sum of $4,000 annual rental in this agreement provided for, it is urged that private space of a like character commands $20,000 a year. * * *

" Nor is there much force in the reasoning that there is no comparison between the rental value of space in the park and such value of a store in a building without the park, the argument implying that the latter would be much higher. On the contrary, the seeming strategic location of the proposed park structures and their alleged attractiveness and ornamentation might probably make them far more desirable from a commercial point of view than a store in a building privately owned."

The appellant contends that there is no evidence whatever to establish that the erection of these two buildings was either necessary or for a proper park use in view of the abundant facilities already existing; that this was established by the evidence of the park commissioner who evidently reluctantly gave his permission for the construction of these buildings; that in view of the fact that they were intended to serve wholly passing traffic and not frequenters of the park they were entirely unnecessary for a park use; that the landscape architect's statutory assent to the structures was not obtained; that the concession in the form of the erection of private buildings was in violation of trusts under which the Battery Park was held, and that the lease was in violation of the law.

Every element of a lease is here present. By its terms there is an attempted alienation of the property of the city for ten years which lease provides that it can be revoked *only* in the event that the city needs this property for a public purpose. This lease is similar in many respects to the ordinary ten-year lease which contains a cancellation clause in case the property should be sold. The contract was intended to be a lease for ten years. It was, therefore, idle to insert a clause therein that the lease might be

canceled upon six months' notice if the land should be needed for
a public purpose, in view of the fact that the commissioner gave
as a reason for the lease that the property involved was useless
for such a purpose.

In *Greenwood Lake, etc.*, v. *New York & G. L. R. R. Co.* (134
N. Y. 435) the court said: "While the instrument creating the
right is termed in the body thereof, a 'license to use said railroad,'
this is not conclusive for the court must look at the nature of the
right rather than to the name that the parties gave it, in order
to learn its true character."

If the instrument purports to yield up exclusive possession of
premises against the world, including the owner, it is not a license,
but creates an irrevocable estate or interest in the land. (*City of
Berwyn* v. *Berglund*, 255 Ill. 498.)

In *Mehlman* v. *Atlantic Amusement Co.* (65 Misc. 25) the defend-
ant let to the plaintiff the right to maintain at Steeplechase Park,
Coney Island, three stands for the sale of candies, one of which
was to be located in the main pavilion of the park, and also the
store room under the Steeplechase tracks, for the summer of 1907.
The court, holding the contract was a lease, said: "While it is true
that the mere use of the words 'lease' and 'let' in the contract
does not necessarily create a lease, as distinguished from a license,
nevertheless, the instrument in suit must be regarded as a lease,
since it gave plaintiff a right to the possession and use not only
of a certain specified space of ground for his stands, but also of the
store room under the tracks, which right of use and possession
certainly affected defendant's right to the exclusive use of its land."

If a commissioner is permitted to make such a lease he can deprive
his successor of all authority over such privileges by making a
lease which will extend over the entire term of such successor. We
are of the opinion that the commissioner was without power to
make a lease. His power was limited to granting a revocable
license. (*Lincoln Safe Deposit Co.* v. *City of New York*, 210 N. Y.
34; *Tompkins* v. *Pallas*, 47 Misc. 309; *McNamara* v. *Willcox*, 73
App. Div. 451; *Brooklyn Heights R. R. Co.* v. *Steers*, 213 N. Y. 76;
*Gushee* v. *City of New York*, 42 App. Div. 37.)

The extent of the authority of the park commissioner is well
stated in *McNamara* v. *Willcox* (73 App. Div. 451) where Presiding
Justice VAN BRUNT said: "It seems to us, upon an examination of
the agreement in question, that it was a mere license revocable at
pleasure. There was no grant of any property right of the city
which the commissioner of parks had a right to make on behalf of
the city, and it was spoken of throughout the agreement as a
privilege which was granted to the plaintiffs. If this is not so

and the agreement is held to be a grant, then clearly it was beyond the power of the commissioner of parks to execute it. He has no power to give away or grant any part of the property committed to his care, or the use thereof; and there is nothing in the case of *Gushee* v. *City of New York* (42 App. Div. 37) which in any way conflicts with this view. It was held in that case that the premises leased were the private property of the city and that it was proper that they should be leased for the use to which they were put; and as long as they were used for that purpose the plaintiffs had a right to rely upon their agreement. But it was expressly stated that if the city should determine in good faith to take away the restaurant the plaintiff would be compelled to submit because he took the agreement subject to the power which the law has given to the city to make these regulations."

It is asserted by the appellant that the commissioner used no discretion whatever in granting this permit, and he points to a letter from the commissioner to the secretary of the mayor as conclusive evidence of that fact. The letter says: " A representative of Mr. J. Antonopulos called on me the other day with a letter asking for certain concessions in Battery Park. From a conversation with you the other day, I understood that the Mayor was interested in this matter."

It is apparent that instead of the commissioner using his discretion, he believed the then mayor desired that Antonopulos should receive the permit to construct the building on the site selected by Antonopulos; that he made no investigation to see if the buildings were necessary, and evidently considered the letter of the mayor a direction to permit the construction of the buildings, whether necessary or proper.

The commissioner of parks admitted that it was the first instance where any one attempted to give a ten-year lease to a private citizen with permission to construct a building on park land for commercial purposes.

The fact that the permit or lease provides that it is intended to promote the comfort and convenience of the public is not conclusive. (*Williams* v. *Gallatin*, 229 N. Y. 248.) That question is for the court to decide.

In *Matter of Niagara Falls & W. R. Co.* (108 N. Y. 375, 383) the court said: " The general principle is now well settled that * * * the question whether the uses are in fact public * * * is a judicial question to be determined by the courts."

In *Queens Terminal Co.* v. *Schmuck* (147 App. Div. 502) the court said: " The determination of these questions is a judicial one belonging to the courts. The fact that the act declares in words

that it is a public act, or even that the taking is for a public use, is not conclusive."

The phraseology of this lease indicates that it was not given for a public purpose or a public use, for it says: " In the event that the spaces occupied by the licensee under this license agreement or any part thereof, shall be required for *any public purpose*," etc.

This statement in effect concedes that the lease was not being given for a public purpose but for a private use. This contention is fortified by the testimony of the park commissioner to the effect that he gave this lease for the reason that he believed this property could not be used for a park purpose. This alone should be sufficient to condemn the whole transaction, for the clause that the lease may be canceled if this property is needed for a public purpose is of little importance when the commissioner in the next breath says this same property cannot be used for a public use. The law is well settled that it cannot be used for other than a park purpose.

We are of the opinion that by the terms of this lease there is an attempted alienation of the property of the city in violation of section 71 of the Greater New York Charter.

In arguing that a long term lease is necessary to make the enterprise profitable, the respondent establishes the fact that this lease was intended to be much more than a revocable license and is an attempted alienation of the city property. If a lease may be made for ten years, why not for twenty years with renewals, if there is no other statutory prohibition.

If the defendant Antonopulos has the right to select an advantageous place in Battery Park to construct not one, but two buildings for commercial purposes, he, or any other favored merchant, might, with the consent of the park commissioner, select a site at Fifty-ninth street and Fifth avenue in Central Park and construct a similar building.

If the contract under review is intended to be a lease of park property, the commissioner was without power to execute it. If it is nothing more than a revocable license, the granting of same was a clear abuse of discretion.

The justice at Special Term on motion for an injunction *pendente lite* met the proposition when he said: " Our parks, as I have come to feel, are already too full of artificial incumbrances and resulting litter, and those who appreciating their civic responsibilities stand guard zealously to preserve the people's rights in a matter so vital to the public health and comfort, deserve high commendation." (126 Misc. 807, 815.)

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

DOWLING, P. J., and MERRELL, J., concur; O'MALLEY and PROSKAUER, JJ., dissent.

PROSKAUER, J. (dissenting). This is a taxpayer's action under section 51 of the General Municipal Law to annul the permit granted by the park commissioner of the city of New York to the defendant Antonopulos for the maintenance of two refreshment booths in Battery Park in New York city as " illegal, unlawful and unauthorized by law, and * * * in violation of the sections of the Charter of the City of New York." The permit conferred upon Antonopulos the privilege of erecting two stands at his own cost where he might, subject to the control of the park commissioner, sell refreshments and food at prices to be approved by the park commissioner. The licensee was required to conform with all rules, regulations and orders of the park commissioner and to discharge summarily any servant or employee against whom the commissioner made complaint. His license was revocable upon a six months' notice " in the event that the spaces * * * shall be required for any public purpose," but was to run for ten years unless so revoked; he was to pay $4,000 a year for the privilege accorded to him. Pursuant to this license Antonopulos erected two booths at a cost of about $17,000. The location of the booths was in an isolated portion of the park, over-shadowed by the elevated railroad structure and surrounded by the subway entrances and ventilators; it was cut off from the main part of the park by a vehicular roadway, and, on substantially undisputed evidence, the trial court has found in effect that no part of the park really usable for recreation or rest has been diverted from such use. It is substantially uncontradicted that the two booths, designed by architects of the highest rank in their profession, are not only sightly in themselves, but serve to screen from the park view the unsightly appurtenances of the elevated railroad structure. It is also undenied that Battery Park is used extensively at the luncheon hour by persons employed in the neighboring office buildings and that the facilities to be offered by the defendant Antonopulos meet a public need. For the plaintiff it is urged that the booths will also serve passers-by coming up the marginal street of the park from the ferry, though it is conceded that this street is within the jurisdiction of the park department. It is also urged that the consideration exacted of Antonopulos is inadequate and that a similar store about 2,000 feet away within the Manhattan Terminal of the Staten Island Ferry rented for about $27,000 per year. It is to be noted, however,

that Antonopulos is under the terms of the license not a free agent as to the prices he may charge, that he is required to erect the booths at his own cost, and that he takes the risk of losing his capital investment at any time upon six months' notice.

Upon these facts we are asked to adjudicate that the park commissioner of the city of New York has diverted park property from a park use. A license to use park property for restaurant purposes is not *ipso facto* a diversion from park use. (*Gushee* v. *City of New York*, 42 App. Div. 37; *Williams* v. *Gallatin*, 229 N. Y. 248, 254.) As was said in the latter case: " Floral and horticultural displays, zoological gardens, playing grounds, and even restaurants and rest houses and many other common incidents of a pleasure ground contribute to the use and enjoyment of the park.  *  *  * They facilitate free public means of pleasure, recreation and amusement and thus provide for the welfare of the community."

We have no right to interfere with this license, therefore, unless we can find that the alleged park purpose assigned by the park commissioner is a mere sham and pretext for the lease of this property for business purposes. The Special Term has found that this was not the fact and on the undisputed evidence could properly have reached no other conclusion. Whether the decision of the park commissioner was wise or unwise is not a matter of judicial concern. The courts have no general supervision over legislative or executive authority and neither right nor power to interfere upon grounds of expediency with the action of administrative or legislative officers. (*Bacon* v. *Miller*, 247 N. Y. 311.)

For the above reasons the judgment appealed from should be affirmed, with costs.

O'MALLEY, J., concurs.

Judgment reversed and new trial ordered, with costs to the appellant to abide the event. Settle order on notice specifying the facts which are reversed.