PUERTO RICO DRYDOCK & MARINE TERMINALS, INC., Plaintiff and Appellee, v. SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellant.

No. 12006. Decided June 22, 1962.

708

*J. B. Fernández Badillo*, Solicitor General, and *Arturo Estrella*, Acting Solicitor General, for appellant. *Fiddler, González & Rodríguez*, and *María Luisa B. Fuster* for appellee.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

ON RECONSIDERATION

By Act No. 77 of May 1, 1941 (Sess. Laws, p. 670) the Legislative Assembly of Puerto Rico authorized the Governor and the former Commissioner of the Interior of Puerto Rico to sell to the United States Government *"for national-defense purposes"* a dry dock constructed by and belonging to the State. No provision was expressly contained therein as to the cession of jurisdiction by the local government in favor of the Federal Government, for which reason we must refer to the provisions of the general law on the subject matter, that is, § 5 of the Act of February 16, 1903 (Sess. Laws, p. 110) which reads as follows:[1]

"That consent be and is hereby given to the United States to acquire for naval, military or other public purposes,

[1] The aforesaid § 5 was repealed by § 1 of Act No. 63 of June 10, 1955 (Sess. Laws, p. 228). The cession of jurisdiction over land acquired by the United States was regulated by Act No. 62 of the same date, to which provisions we shall refer hereinafter.

by purchase or condemnation any lands within the island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the People of Porto Rico shall cease and terminate; Provided, however, that upon the subsequent *alienation* by the United States of any land so acquired the People of Porto Rico shall again have jurisdiction thereover."

The facts which give rise to this suit are set forth in the opinion published in 82 P.R.R. 636 (1961), and briefly stated we may say that the plaintiff-respondent Puerto Rico Drydock & Marine Terminals, Inc., as lessee of the dry dock, attacks the jurisdiction of the Commonwealth to assess taxes on a personal property belonging to said plaintiff–respondent which was physically located, on January 1, 1952, within the leased premises, that is, in the dry dock.

1. In fact, the controversy in the present case is reduced to determining whether by virtue of the aforesaid lease the Commonwealth reacquired jurisdiction for the purpose of levying taxes on the property located within the dry dock leased on the ground that it is one of the species of "alienation" mentioned in § 5 of the Act of February 16, 1903, *supra*. In our original opinion, 82 P.R.R. 636, 649, we held that since the term alienation in its strict sense implies a conveyance of ownership, and in its broad sense, in the Spanish law, it does not include a lease, the United States Government had not lost its jurisdiction.[2] It is so indeed if we exclusively apply to the situation the provisions of the civil law and the corresponding sections of the property law.

---

[2] As stated by the appellant in his memorandum in support of the motion for reconsideration, both litigants induced the court to consider and decide the question of interpretation of the term "to alienate" on the basis of the Spanish text of the Act of 1903. It is in the motion for reconsideration that our attention is called to the fact that in the English text of the Act, which is the one that should prevail, the term "alienation" is used for *"enajenación"* and that it is to the interpretation of this term that we must look in order to determine the scope of the saving clause made by the People of Puerto Rico when ceding exclusive jurisdiction to the United States over the dry dock.

But as we delve deeper. into the problem it seems to us that its solution does not rest in the exclusive application of those provisions but that other considerations come into play which, within the process of interpretation of the specific section, and as a matter of local law, call for a different result.

■ In the first place, the Act of 1903 was signed in the English language by the then Governor William H. Hunt. The Executive Council corresponding to our present Senate was composed of six Continentals[3] and five Puerto Ricans,[4] § 18 of the Organic Act of 1900, known as the Foraker Act, 1 L.P.R.A. 22, 34–35, and this Executive Council, exercised legislative functions as one of the two Houses, § § 27 and 31 of said Organic Act, 1 L.P.R.A. 37, and 38–39. We should adhere, therefore, to the meaning of the word "alienation" which was translated into Spanish as *"enajenación"* and consider the latter subordinate to the meaning of the former. See, *People* v. *Charón*, 7 P.R.R. 416 (1904) ; *Cruz* v. *Domínguez*, 8 P.R.R. 551 (1905) ; *People* v. *Torres*, 9 P.R.R. 396 (1905) ; *People* v. *Agosto*, 10 P.R.R. 425 (1906) ; *People* v. *Acosta*, 11 P.R.R. 240 (1906) ; *People* v. *Santiago*, 16 P.R.R. 446 (1910) ; *Manrique de Lara* v. *The Registrar*, 23 P.R.R. 803 (1916) ; *People* v. *Báez*, 40 P.R.R. 12 (1929) ; *People* v. *Noonan*, 46 P.R.R. 700 (1934) ; *People* v. *Fonseca*, 62 P.R.R. 413 (1943) ; *People* v. *Díaz*, 62 P.R.R. 477 (1943) ; *Pérez* v. *District Court*, 69 P.R.R. 4 (1948) ; *People* v. *Zayas*, 72 P.R.R. 17 (1951) ; *cf. Seín* v. *González et al.*, 26 P.R.R. 164 (1918) ; *Venegas* v. *District Court*, 41 P.R.R. 469 (1930) ; *De Castro* v. *Board of Commissioners*, 57

---

[3] The Continental members of the Executive Council were Charles Hartzell (Executive Secretary), James S. Harlan (Attorney General), John R. Garrison (Auditor), William F. Willoughby (Treasurer), William H. Elliot (Commissioner of the Interior), and Samuel M. Lindsay (Commissioner of Education).

[4] The Puerto Rican members of the Executive Council were José Celso Barbosa, José Guzmán Benítez, José Gómez Brioso, Rosendo Matienzo Cintrón, and Andrés Crosas.

P.R.R. 149 (1940) ; *Basora* v. *Padilla*, 62 P.R.R. 315 (1943).
Even though the term "alienation" ordinarily presupposes a
transfer of ownership or encumbrance thereon, such a result
does not always prevail and there are American cases—par-
ticularly related to leasehold of Indian reservations for the
exploitations to determine the existence of natural oil and
gas mines—which admit that a lease constitutes an "aliena-
tion". · See *Eldred* v. *Okmulgee Loan and Trust Co.*, 98 Pac.
929 (Okla. 1908) ; *Sharp* v. *Lancaster*, 100 Pac. 578 (Okla.
1909) ; *Barnes* v. *Stonebraker*, 113 Pac. 903 (Okla. 1909) ;
*Duff* v. *Kearton*, 124 Pac. 291 (Okla. 1912) ; *Barley* v.
*King*, 157 Pac. 763 (Okla. 1916) ; *Mailhot* v. *Turner*, 121
N.W. 804 (Mich. 1909) ; *Williams* v. *Hylan*, 215 N.Y. Supp.
101 (1926) and 227 N.Y. Supp. 392 (1928). In its broadest
sense the term is identified, therefore, with the possession
and control over the property. It is unquestionable that in
a leasehold it is the lessee who has this control and possession.

· Furthermore, on different occasions we have recognized
specific effects to the relationship between lessor and lessee
which go beyond the mere obligations which produce a purely
personal or credit right, and irrespective of the fact that by
its registration it might have specifically acquired the nature
of a "real" right.* Thus, for condemnation purposes we
have protected the right of a lessee whose contract was not
recorded in the registry, to participate in the distribution of
the money deposited as the fair and reasonable value of the
condemned property. In *People* v. *McCormick, etc.; Floor
Cov. Co., Int.*, 78 P.R.R. 895, 901 (1956), we referred "To
the extent the lease *impairs* the value of the dominion title,
the lessee must be compensated out of the amount which
represents the full value of the dominion title, and not in
addition thereto," even though the contract was not recorded.

---

* (Transl. Note)—This refers to the *"derechos reales"* of the Civil
Law, a juridical concept that does *not* correspond to the "real property
rights".

And in *Galiñanes Hnos.* v. *Superior Court*, 77 P.R.R. 836 (1955), in holding that a lessee could evict a sublessee on the ground that he needed in good faith the subleased premises to enlarge his own business, we stated at p. 841 that:

"In civil law, sublease means the voluntary relinquishment of part of the property right. 'The use or enjoyment is a right inherent in the thing and inseparable therefrom; *it is one of the various rights which make up the dominion,* and therefore belongs to the owner who, precisely for that reason, may dispose of it by onerous or lucrative title, for more or less time, with greater or lesser extension. It is absurd that if the use or enjoyment of a thing is conveyed without consideration, it constitutes a 'real' right * of usufruct, or use, or habitation, and that it is not so when the conveyance is made in some other way, under another name, or on payment of a specified rental. In either case, in conveying the use or the right the owner dispossesses himself of it, loses it, and delivers it to another. If afterwards he wishes to sell or give in payment the object or thing with all rights inherent therein, he may convey everything that was not conveyed theretofore, not what he already gave, since it is a principle even of common sense that no one can give what he has not, that which is not his, what he himself gave preciously to another.' 10 Manresa 467, 468 (5th rev. ed. of the *Instituto Editorial Reus,* 1950).

"In this commentary, Manresa expresses two concepts which clarify sufficiently the juridical phenomenon found in the lease: (1) that the lease is one of the rights of disposal (*jus disponendi*) of ownership, and, therefore, one who leases disposes of part of his property right in favor of another person, and (2) that the lease is by nature a property right transmissible in part from one person to another."

See, also, by way of comparison, *Berrocal* v. *District Court,* 76 P.R.R. 35 (1954).

Finally, the Legislative Assembly indicated unequivocally its intention to that effect upon approving §§ 3 and 4 of Act ·

---

* (Transl. Note)—This refers to the *"derechos reales"* of the Civil Law, a juridical concept that does *not* correspond to the "real property rights."

No. 62 of June 10, 1955 (Sess. Laws, pp. 224, 226) which read as follows:

"Section 3.—The said jurisdiction shall be understood as being granted upon the express condition that within the lands acquired by the United States arrests originating under the laws of the Commonwealth of Puerto Rico may be made and summonses originating under the said laws may be served. Also, attachments and such other judicial provisions as the courts of the Commonwealth may decide upon may be executed with regard to properties located on the said lands, provided that neither the properties of the United States, nor the use or benefit which the United States derives from the said properties, nor the purposes for which the lands were acquired, are affected.

"Section 4.—The jurisdiction granted shall continue only while the United States is the proprietor or is in possession of the lands and the lands are used for the naval, military, or other public purposes for which they were acquired. *In the event that the United States ceases to be the proprietor of the lands or to be in possession of same, or in the event that they are not used for the purposes for which they were acquired,* the Commonwealth of Puerto Rico shall again have jurisdiction over same."

It will be noted that the controlling test of jurisdiction is the ownership or *possession* by the United States of the land ceded and the continuation of the use thereof for naval or military purposes and other public purposes for which they were acquired. In our opinion we are dealing with an interpretative law[5] in force from the very date of the Act interpreted thereby. As to the explanation of this principle of hermeneutics, see the dissenting opinion of Mr. Justice Belaval in *Ginés* v. *Ayala,* 84 P.R.R. 238 (1961),

---

[5] The judgment in the case at bar was rendered on May 5, 1955; Senate Bill No. 626 which later became Act No. 62 of 1955 was presented on March 10, 1955, and the Act was finally approved on the following June 10. For the legislative history of this Bill see Journal of Proceedings of 1955, pp. 2122 and 2123 (Report of the Juridical Civil Committee.)

and particularly the references to the commentaries of the textwriter PUIG PEÑA on the matter appearing in Vol. I of Tome I of his *Tratado de Derecho Civil Español* 440–41. Our opinion is buttressed not only by the fact that the approval of the Act was contemporaneous with the date of. the judgment rendered in the present case, to which we refer in footnote 5, but also by the fact that the Act which authorized the cession of the dry dock expressly provided that its acquisition by the United States was for "national defense purposes," and that, therefore, the jurisdiction could be understood as being granted upon the condition of compliance with such purpose alone. We can not ignore that the cession of jurisdiction can not be divorced from the purpose for which said jurisdiction is exercised, for there have been other cases where notwithstanding the fact that the property was conveyed to the Federal Government we have still retained local jurisdiction for certain purposes. *Cf. López v. District Court,* 58 P.R.R. 117 (1941); *People v. Suárez,* 51 P.R.R. 877 (1937). Insofar as the levy of taxes is concerned tax immunity does not exist except in cases of federal property, for we find no justification for extending immunity to a third person who has no immediate relation with the government in the private exploitation of the dry dock.

2. With respect to the Military Leasing Act, we expressly ratify our holding in our original opinion. The new contentions of the Secretary of the Treasury do not warrant our disturbing the result reached therein. See KEESLING, *Property Taxation of Leases and Other Limited Interests,* 47 Cal. L. Rev. 470, 487 (1959).

The motion for reconsideration will be granted and, consequently, the judgment rendered by the Superior Court, San Juan Part, on May 5, 1955, will be reversed.

Mr. Justice Pérez Pimentel and Mr. Justice Rigau concur in the result. Mr. Justice Santana Becerra did not participate herein.