Jacob Maekowitz, J.
The parks of New York City are in the nature of a public trust to be administered in the public interest by the city’s duly-elected officials. In this suit the court is asked to decide whether the use of the corner of Central Park near the intersection of 59th Street and Fifth Avenue as a “ cafe-restaurant ” would violate the trust purposes for which the public parks are held and administered.
The proposed use of Central Park stems from discussions between Huntington Hartford, a public-spirited New Yorker, who was desirous of contributing a large sum of money for the benefit of New York City’s residents, and Robert Moses and Newbold Morris, successive Commissioners of Parks. After a number of suggestions and counter-suggestions, Mr. Moses, in *184 a letter dated November 13, 1959, put forward the idea of a “ cafe operation ” at the southeast corner of Central Park. This idea was enthusiastically received and a formal offer of sufficient money to cover the cost of design and construction of such a facility was made to the City of New York by the Huntington Hartford Family Fund. Thereafter, the world-renowned architect, Edward D. Stone, designed the facility and the design was unanimously approved by the City Art Commission. Based on such approval and his independent judgment of the merits of the proposal, the Commissioner of Parks recommended that the city accept the gift and this was accomplished in 1960, after public hearings, by a unanimous vote of the city’s Board of Estimate.
The present taxpayer suit to enjoin and declare illegal the use of a corner of Central Park as a cafe-restaurant was instituted in 1960 by a corporation owning valuable real estate in the vicinity. The original complaint alleged that the contemplated use was “ of a sort not constituting a valid park use ”, that it “ would be contrary to the purposes and trusts upon which the said park was acquired and erected ’ ’, and that it ‘ ‘ would be an unlawful encroachment upon Central Park”. The Appellate Division sustained a motion to dismiss this original complaint on the ground that these allegations were ‘ ‘ merely broad conclusions of law” (13 A D 2d 733, 734). In granting leave to replead, that court indicated that ‘6 The letting of park property for restaurant purposes does not in and of itself constitute an improper use of such property (Gushee v. City of New York, 42 App. Div. 37; see, also, Williams v. Gallatin, 229 N. Y. 248, 254) ” and that an actionable complaint should set forth facts “ showing in what respects it would be unlawful for the defendants to use park property for the particular purpose contemplated ” (13 A D 2d 733).
In their supplemental and amended complaint, which has been sustained at Special Term, in the Appellate Division and in the Court of Appeals (15 A D 2d 457, affd. 11 N Y 2d 918), the plaintiffs * allege, in substance: (1) that the proposed use involves “ destruction of a rural area * * * [of] more than twenty-two thousand square feet ’ ’ and its replacement by a “ two story rectangular glass building of a height of approximately twenty-five feet, a width of approximately sixty-four feet, and a length of more than one hundred and ninety feet ’ ’, with attendant *185 removal of trees, park benches and footpaths, as well as paving of existing lawns; (2) that the corner of the park which would be “destroyed” provides an entrance to the park situated uniquely in relation to Fifth Avenue, “ one of the finest commercial and scenic streets in the City ’ ’ and provides the easiest access to the park for the “ hundreds of thousands of persons ” in the midtown area who ‘ ‘ would be required to walk many of thousands of feet further than they presently do in order to reach a quiet, rural part of Central Park; ” (3) that “there are now numerous eating and drinking establishments ” near the area of the proposed cafe-restaurant and the new facility, if operated by a private concessionaire, “ would constitute a subsidized tax-free business which would compete with privately owned tax-paying businesses nearby”; (4) that the corner in which the cafe-restaurant is to be built “ is one of the most congested intersections in the City of New York ”; and (5) that, because of the location of its entrances, the proposed facility is ‘ ‘ designed principally to serve persons who come from places other than Central Park ” and, furthermore, that it “ would not be available to other members of the public who might not desire, or could not afford, to be patrons ”.
Before turning to the factual evidence adduced at trial, it is necessary to consider the legal basis for the complaint. It is brought under section 51 of the General Municipal Law which provides, in pertinent part, that a taxpayer may sue “ to prevent any illegal official act on the part of [municipal] officers, agents, commissioners or other persons, or to prevent waste or injury to * * * any [municipal] property Although, on its face, this statute might seem to have envisaged a broad inquiry into official conduct of municipal affairs, the Court of Appeals has expressly rejected such an interpretation of it and has, instead, read the statute quite narrowly.
Thus, in Talcott v. City of Buffalo (125 N. Y. 280), one of the earliest cases under section 51, the court declared (p. 288): ‘ ‘ Full force and effect can be given to the statute by confining it to a case where the acts complained of are without power, or where corruption, fraud or bad faith, amounting to fraud is charged. Any other construction would subject the discretionary action of all local officers and municipal bodies to review by the courts at the suit of the taxpayers, a result which would burden the courts with litigation, without increasing the efficiency of local administration.” This view of section 51 was recently reaffirmed in Kaskel v. Impellitteri (306 N. Y. 73) where the court, per Chief Judge Desmond, stated unequivocally that a taxpayer cannot succeed unless he shows corruption or fraud *186 or “ unless there is a total lack of power in defendants, under the law, to do the acts complained of ” (p. 79).
Since, in the present suit, there is no hint or suggestion of fraud, corruption or bad faith, either in the complaint or in the trial evidence, the sole remaining basis for relief is a showing of “ a total lack of power in defendants, under the law, to do the acts complained of” (Kaskel v. Impellitteri, supra, p. 79). In order to determine, however, whether the Commissioner of Parks of the City of New York acted with “ a total lack of power ” in deciding to construct a cafe-restaurant at the southeast corner of Central Park, the court must first inquire into the extent of his power. This is plainly set forth in section 532 of the New York City Charter, which provides, in its relevant provisions, that the Commissioner of Parks “shall have the power and it shall be his duty: * * *
“3. To maintain the beauty and utility of all parks, squares, public places and playgrounds and other recreational properties * ° * and to institute and execute all measures for the improvement thereof for ornamental purposes and for the beneficial uses of the people of the City.
& s¡ %
“9. To have the management, direction and control of all real or personal property granted, devised, bequeathed or conveyed to the city for the extension, improvement or ornamentation of the parks, squares or public places in the city or for the establishment or maintenance, within the limits of any such park, square or public place, of museums, zoological, botanical or other gardens, collections of natural history, observatories, or works of art, or playgrounds or other recreational properties, and upon such trusts and conditions as may be prescribed by the grantors or donors thereof and accepted by the commissioner.” (Emphasis supplied.)
Thus, the simple issue presented to this court after trial is whether the plaintiffs have proved that there is a “ total lack of power” (Kaskel v. Impellitteri, 306 N. Y. 73, 79, supra) under section 532 of the New York City Charter to erect a cafe-restaurant, of the type contemplated, in the southeast corner of Central Park. If the erection of the proposed cafe-restaurant was shown to have no reasonable relation to the duties and powers of the Park Commissioner, if it had no reasonable relation to the purposes for which the parklands of New York City are to be held and developed, the plaintiffs should prevail. On the other hand, if there is such a reasonable relation of the facility in question to the exercise of the Park Commissioner’s *187 statutory powers and the fulfillment of the trust vested in him to preserve the parks, then his judgment must he sustained, even if it be shown to be ill-founded and unwise. In other words, this court’s mandate, under statute and the decisions of the Court of Appeals, is not to review the wisdom or propriety of the Park Commissioner’s acts — the political process is the proper arena for such review — but only to consider whether those acts were done in fulfillment of and within the bounds of his statutory authority.
Because of the obvious and substantial public interest in the issue, the plaintiffs were given the widest latitude of inquiry and of proof at trial. Some of their evidence or offer of evidence was completely irrelevant to the issue outlined above and some of it went to the wisdom rather than the power of the Commissioner of Parks. The evidence which was appropriate and germane failed to prove their case.
I consider the traffic conditions in the area of 59th Street and Fifth Avenue, at the site of the proposed cafe-restaurant, irrelevant to the question of the Commissioner’s legal authority to construct such a facility. Likewise, it is irrelevant — even if true — that the proposed cafe-restaurant would compete with existing restaurants in the area. If the cafe-restaurant serves park purposes but disrupts traffic or causes a financial loss to existing businesses, this might cast doubt on its political wisdom, but it hardly reflects a lack of power in the Park Commissioner.
In any event, the proof adduced or offered at trial on these issues was clearly insufficient. The traffic counts offered were restricted to peak shopping hours, weekdays between 11:00 a.m. to 4:00 p.m. The use of the proposed cafe-restaurant was not, however, restricted to these hours and, in fact, the evidence gave reason to believe that the peak use of the cafe-restaurant would occur in leisure hours, on week ends and in the evenings. Concerning competition, although it is obvious that some local restaurants will suffer to some extent, I find that the intended purpose and design of the new facility is so novel and unique that it is, in good part, noncompetitive with more traditional forms of eating establishments.
The more substantial and germane aspects of the plaintiffs’ proof related to the alleged destruction of aspects of Central Park’s rural character and to the alleged intent to create a commercial luxury restaurant, serving people from outside the park, with no relationship to the park or the public purposes it serves. Turning to the first of these questions, the proof failed entirely to sustain the allegations of the complaint. The impression conveyed by the complaint is that the proposal here at issue involves *188 the destruction of a portion of the park luxuriant with grass and trees and presently widely used for strolling, sitting or lying beneath and amidst nature’s bounty. And in place of such pristine beauty — according to the suggestions of the complaint — was to be imposed a gross commercial structure, an affront to nature’s way, which would extend the city into the fast-vanishing park.
The vision of the emasculation of Central Park thus contemplated in the complaint was not substantiated by the proof at trial. As for the present use and character of the area concerned, Commissioner Morris testified — and this testimony was virtually uncontradicted — that: “ The site itself was not used by human beings except for purposes that I wouldn’t want to mention in this court. You cannot sit on it. You cannot play on it. The trees are scraggly * * *. There was a very steep bank of earth on which no children would play and no adults could sit, it is mud ”.
According to further Park Department testimony, the area here concerned is substantially unused in the normal course of events, due to its sloping contour and the existence of open grills in which are contained subway ventilators. These grills extend east and west for substantially the entire area and face into the park from the bottom of the retaining walls which separate the park from the sidewalk. The ventilators emit odors and noises which discourage use of the adjacent area. Such use is further discouraged by the paucity of grass and by the sloping contours of the land. The trees rather than numbering 40, as alleged in the complaint, number 25, and rather than being monuments to nature, are “ scraggly.”
The addition proposed in the area is not an ordinary commercial brick building, housing a restaurant or bar. It is rather a glass-enclosed pavilion, designed in form and structure to be absorbed into and become part of the park setting.
The pavilion will be located on 59th Street and the “ Bast Drive, ’ ’ which is the vehicular exit from the park at its southeast corner. The site is separated from Fifth Avenue on the east by General Sherman Square.
As has been indicated, the site concerned slopes steeply and the pavilion fits its two levels into this contour, the upper one approximately 16 feet above 59th Street and the lower one on the same plane as the pond in that corner of the park. The structure is topped by a flat roof and its glass sides are designed to be retracted when weather permits, creating the effect of an open colonnaded space bordering the park. The open pavilion effect is further enhanced by the fact that the main structure will itself *189 be surrounded on all sides by open terraces on which there will be tables. These terraces are, however, separated by trees and shrubbery from the sidewalks, both the 59th Street and East Drive sides, so that, strictly speaking, the proposed structure is not a “ sidewalk-cafe ”.
On the lower level the pavilion’s dimensions are 64 feet wide (running north south) and 239 feet long (running east west) and, on the upper level, 32 feet by 160 feet. Its total height is 30 feet, but, as indicated, only about 16 feet are above the level of 59th Street.
Three entrances into the upper level of the pavilion are planned from the 59th Street side, each about 9 feet wide. Another entrance of the same width is planned for the ‘ ‘ East Drive ” side. The entrance to the lower level from the park proper is 30 feet wide. No parking facilities for the pavilion are to be constructed, although a service road for delivery vehicles, 24 feet wide by 160 feet in length, will lead to the lower level at its northeast corner.
The pavilion will occupy 20,416 square feet or one-half acre, representing .06% of the total park acreage. Its terraces will occupy another 11,482 square feet. A total of 358 people can be accommodated on the pavilion’s two levels and another 604 persons can be accommodated on the outdoor terraces.
The plans call for filling in a very small portion of the large pond located in the southeast corner of the park to create 4,000 new square feet of land and walks. Of the 25 trees presently at the site, 20 are to be removed and 5 to be transplanted. It is proposed, however, that 63 new trees, together with a great deal of shrubbery and many flowers and hedges will be planted. The plans also call for new footpaths, replacing benches, illuminated fountains in the pond with jets spraying water into the air and illumination of the foot bridge.
The brilliant floodlighting of the depressed, now dark area around 59th Street will induce people to walk in that portion of the park, though they do not use the cafe itself. It will make one more land of light in Central Park for people to move within and about with a feeling of safety. Commencing with this additional land of light; the Mall in Central Park where concerts are held; the Wollman Rink, where ice skating, roller skating and dancing take place at night; the Tavern on the Green, where dining and dancing are offered after dark; and the Delacarte Theatre, where Shakespeare, ballet and other artistic events are presented in the evening, combined, will afford a chain of islands of light between which people may move with a feeling of security.
*190 It is obvious that the appearance of Central Park at the location concerned will be changed by the proposed use, and it is equally obvious that the natural contours and elements of the park will also be transmuted. But transformation of parklands from their natural state to other park uses — e.g., into recreation areas, such as tennis courts and bridle paths, bandstands, beaches or open-air theatres — does not involve a violation of park purposes. It merely involves a change from one proper park use to another.
In my judgment, the proposed Hartford Pavilion will enhance the beauty and natural appeal of the southeast corner of Central Park without destroying the tone and character of upper Fifth Avenue. The contemplated structure is of a design and character— has a “ feel ” to it — which expresses joy, openness and light, and, according to the expert testimony, it is of a type which has long been found as part of parks in this country as well as western Europe. Rather than turning parkland into city pavement, as the complaint suggests, Hartford Pavilion promises to refurbish and extend the present dimensions of Central Park by a unique, distinctive and cultural addition. It is as natural to the park as a boathouse is to a lake. In all likelihood it will be considered in the future as one of the finest of its kind in the United States.
Turning from the character of the structure to the nature of its contemplated use, it is likewise found that the plaintiffs failed to meet their burden of proof on this score. As noted above, in dismissing the original complaint, the Appellate Division plainly held that “ The letting of park property for restaurant purposes does not of itself constitute an improper use of such property ”. The plaintiffs sought to avoid the force of this plain holding by attempting to prove that the proposed restaurant was not intended as an addition to the park in that it would serve those coming from outside the park and in that it would serve a restricted group of people rather than the public at large.
Actually, proof on both of these scores was negligible, and what proof there was was highly speculative and ambiguous in character. It is obviously true that since it borders on the edge of the park, the pavilion will attract some people from the adjacent areas outside the park. It is also apparent that some people will come to the vicinity for no other reason than to enjoy the pavilion’s facilities.
On the other hand, it should be remarked that the proposed site is in the southeast quadrant of the park, which contains the park’s chief attractions, such as the zoo, skating rink, carousel and children’s zoo, acting as magnets for a large number of park *191 users. It can hardly be doubted that large numbers of such park users will subsequently be attracted to and enjoy the hospitality provided by the pavilion. Such use of the pavilion will thus enhance the existing satisfactions and attractions of the park.
Even were we to suppose, however — and this supposition or its negation are equally speculative in the light of the proof offered at trial — that most users of the pavilion will come from outside the park, this is no reason to deny that the facility serves park purposes. The Wollman skating rink and the Shakespeare outdoor theatre — to name just two such facilities — are both facilities of a type which could and do exist outside the park setting. Both of them also, undoubtedly, attract patrons who come into the park solely to skate or enjoy the theatre, rather than patrons who enter the park for other park purposes and use the facility concerned as an incident to those other “primary” park purposes. And yet the skating rink and theatre are well-established and conceded park facilities. The proposed pavilion will have the same status; although it attracts “ primary users ” and although it could function in a nonpark setting, it is nevertheless an appropriate park facility.
The test of a nonpark use, in the opinion of this court, is not whether the facility attracts people who are not already in the park. On this test, the skating rink and the open-air theatre would not qualify either. The test is rather whether the facility concerned offers substantial satisfactions to the public, which would only be possible in a park setting. Thus, one can ice skate in an enclosed arena, but ice skating in a park setting has its own glory. Likewise, the Shakespearean repertoire can be enjoyed in a traditional theatre, but playing Shakespeare on an open stage and under the stars offers a new dimension of aesthetic satisfaction. Similarly, food and drink are available at numerous traditional restaurants, but the savor of a meal or evening coffee, a snack or an aperitif, in the park setting is a unique one. Anyone who has enjoyed food and drink on the plazas and pavilions of Europe, or, for that matter, in other park settings in this State,* will recognize this. The very nature and character of the important satisfactions which the pavilion promises are intrinsically related to its park location, and this, rather than its attraction primarily to park users, qualifies it as a legitimate park facility.
*192 Plaintiffs concede that those who come to a park to relax amidst the rural surroundings and to gaze in quiet contemplation at the grass and upon the flowers and the other natural ornaments not normally found elsewhere in the city are using the park for park purposes. Thus, plaintiffs’ contention that people sitting in a cafe-restaurant in the park, gazing at the very same scenery, are not using the park for park purposes, is unpersuasive.
Of course, if it were true, as the plaintiffs suggested in their complaint, that the pavilion was intended to provide food and drink at luxury prices, this might cast doubt on the propriety of its operation as a public park facility. The plaintiffs did offer an architect who testified that he could judge from the design of the kitchen facilities that only luxury service was intended; but this same architect admitted the same facilities could be used for restaurant purposes, whether high class, low class, medium class, or luxury class. Furthermore, the terms of the Hartford gift, as well as the announced intentions of the park and other city officials, would be violated were the pavilion restricted solely in use to the elite, rather than open to broad segments of the public. This court is bound to presume that the City of New York will live up to the conditions under which it accepted the gift and that its officials will meet their professed obligations. If this presumption is erroneous, it is time enough to complain when the violation is actual, rather than merely speculative, as it is in the present posture of planning. Such purely speculative suppositions concerning a feared mode of operation of a still unconstructed restaurant cannot and should not serve as the basis for a decision enjoining, completely, construction of that facility.
Ultimately, the only real source of dissatisfaction with the proposed Hartford Pavilion — the motive force which led to some newspaper criticism and some other opposition — is that it replaces the green of nature with human effort. In part, this criticism reflects a legitimate and urgent social interest in the preservation of a necessary modicum of untrammelled natural beauty amidst civilization. In part, however, such criticism of the Hartford Pavilion is based upon a romantic longing for a past that can and should no longer be.
The realities of our everyday city life require that every attempt to improve a park so as to better satisfy human needs for relaxation, refreshment and enjoyment should be encouraged rather than be met with strong opposition. The point of view of a minority interested in preserving its satisfactions amidst unimproved natural settings should not be imposed upon a *193 majority which seeks and finds satisfaction in sipping coffee or a liqueur seated at a table surrounded by trees.
It is true, to be sure, that, in an 1858 work by Olmstead and Vaux, entitled “ Greensward ”ora“ Plan for the Improvement of the Central Park ”, which was an early award-winning design for the park, it was said that “the interest of the visitor * * * should concentrate on features of natural, in preference to artificial, beauty.” The fact is, however, that Olmstead himself later recognized limitations to this view when he said in a speech before the American Social Science Association, in Boston, in 1870, that “ It will be found not a very simple matter to determine * * * what forms of * * * recreation’s opportunities can be provided in a large town, consistently with good order, safety and economy of management.”
More important, however, is the fact that neither this court nor those responsible for the design and maintenance of the city’s parks is now bound by statute or decisional law to the conceptions, admirable though they may be, of the original designers. As times change, park uses change, and section 532 of the New York City Charter gives the Commissioner of Parks abundant discretion to satisfy changing concepts of parkland use. As the Pennsylvania Supreme Court declared in Laird v. Pittsburg (205 Pa. 1, 5): “No doubt the idea of open air and space, with the land kept in grass and trees, as if approximately in the state of nature, still inheres in the general understanding of the word ‘ [park] ’, but it is no longer the dominating thought as it formerly was. The chief amusements of the great body of our ancestors in England were in the open air, and a park meant for them practically a small or private forest, left in condition for the home of wild animals of the chase. * * * With the change of manners and habits of the people came also a change in their associations with the use of words.”
In sum, the plaintiffs’ real complaint is that they doubt the wisdom of replacing more of Central Park’s greenery with any improved park facility. This being so, their true avenue of relief is in the legislative councils of the city rather than in the courts (see Kaskell v. Impellitteri, 306 N. Y. 73, supra; Talcott v. City of Buffalo, 125 N. Y. 280, supra; Matter of Young [Morris], N. Y. L. J., May 5, 1961, p. 15, col. 4).
The cases (Sebring v. Quackenbush, 120 Misc. 609, affd. 214 App. Div. 758; Matter of Central Parkway, 140 Misc. 727; Incorporated Vil. of Lloyd Harbor v. Huntington, 4 N Y 2d 182; Brooklyn Park Comrs. v. Armstrong, 45 N. Y. 234; Parsons v. Van Wyck, 56 App. Div. 329; Blank v. Browne, 217 App. Div. 624; Williams v. Hylan, 223 App. Div. 48, affd. 248 N. Y. 616; *194 Williams v. Hylan, 126 Misc. 807, affd. 217 App. Div. 727; Freidberg v. City of New York, 151 N. Y. S. 2d 258, affd. 2 A D 2d 664; Matter of County of Westchester v. Rizzardi, 39 Misc 2d 820) cited by plaintiffs are inapplicable. They either deal with applications for temporary injunctions or circumstances which substantially differ from the facts of the within ease.
I am persuaded that the proposed facility is within the power of the Park Commissioner, and, therefore, its construction may not be enjoined. I am further of the opinion — though this is plainly not germane to my decision — that, in this instance, the present Park Commissioner and his predecessor have amply and commendably fulfilled their public trust to preserve and protect the parks as sources of public enjoyment. As for Huntington Hartford, I shall only observe, in conclusion, that few men have labored so long, against such strenuous opposition, to give upward of a million dollars away for a beneficial public purpose. Judgment for the defendants.

 The original complaint was instituted by a single corporate plaintiff. The amended complaint was filed by additional corporate and individual plaintiffs owning valuable real estate in the area adjacent to 59th Street and Fifth Avenue. Walter Having’s application to withdraw as a party plaintiff is granted.

 Defendants’ Exhibit J is a descriptive brochure of New York State Parks and it shows that, aside from refreshment stands and cafeterias, there are 11 restaurants in the parks of this State. How many of these restaurants have open terraces for dining was not shown, but it is surely a substantial number.