William C. Hecht, Jr., J.
This action seeks to enjoin the erection of a memorial in Riverside Park between 102nd and 106th Streets, in the Borough of Manhattan. It is brought by plaintiff taxpayer against former Mayor Wagner, former Park *276 Commissioner Morris, Mayor Lindsay and Park Commissioner Moving, and the contractors to whom the construction contracts have been awarded. Work on the project has been temporarily stayed pending determination of the instant motions — by plaintiff for an injunction pendente lite, and by defendants to dismiss the complaint on the ground that it fails to state a cause of action. (CPLR 3211, subd. [a], par. 7.) The pertinent allegations of the complaint are:
The family and friends of Adele Bosenwald Levy made a formal offer to the city of a gift of $500,000 towards the construction of a memorial to Mrs. Levy. It appeared that the cost of the memorial would be approximately $1,000,000, and it was stipulated that the city was to bear all costs of the operation and maintenance thereof.
The complaint alleges that, while the memorial is ostensibly designed as a recreational complex, in fact its erection “ would constitute an unwarranted and unlawful wastage, encroachment and destruction of the portion of the park in which it was proposed to build the said Memorial; that the cost to the City of New York for its share of the construction of the said Memorial would involve extravagantly large sums of money; that the annual upkeep and maintenance of the said proposed Memorial would involve the expenditure of tens of thousands of dollars annually when funds were not then (and are not now) available for the ordinary maintenance and rehabilitation of the existing park facilities; that the said proposed Memorial would duplicate existing facilities; that it would serve no legitimate park purposes; that it would serve but the vanity of the donors; that the expenditure of city funds, which would be required in connection with the construction, operation and maintenance of the proposed Memorial was unwarranted because of the limited usefulness of such Memorial; that it was too large in scale and too dramatic in conception to be suitable for neighborhood use by mothers and small children; ” (par. Twenty-Third).
It was alleged further that Park Commissioner Morris was at first opposed to the expenditure of these funds. But, after the proposed donors had appealed to Mayor Wagner, the latter, ‘ ‘ without having before him any valid criteria for a consideration of the proposed Memorial, and disregarding his legal obligations as Mayor of the City of New York, immediately directed Newbold Morris, as Commissioner of Parks of the -City of New York, to accept the proposed Memorial and to proceed forthwith to implement such acceptance.” It is alleged further that the requisite approval of the Municipal Art Commission and *277 the Department of Buildings and Housing had not been obtained.
The affidavit of former Commissioner Morris, submitted in support of the motion to dismiss (see CPLR 3211, subd. [c]), gives a detailed description of the facility and its proposed use. The affidavit acknowledges that the Commissioner had previously opposed the proposal, primarily because it would cost about $1,000,000. “ I was of the opinion that the expenditure of such a sum for a neighborhood park facility was improvident at that time because of budgetary limitations. It was also my belief that if such a facility was constructed in one neighborhood, other neighborhoods would demand equal consideration and that the City’s financial condition was such that equal consideration for construction of such a facility in other neighborhoods throughout the City was impractical.”
However, after Mr. Morris advised the Mayor of his objections to the financial expenditure, and that the facility proposed was too large in scope, the Mayor informed him of the proposal of private parties to donate $500,000, and that the proponents agreed to a modification of the proposal to reduce it in size. This caused the Commissioner to agree to the proposal. His reasons are thus stated in paragraph 10:
“ The factors which I considered before making a determination to construct this park facility are the following: Almost from the inception of my tenure as Commissioner various civic organizations and individual citizens who were residents in the area, requested the department to provide recreational facilities for pre-school children which would be situated close to the upper level of Riverside Drive in the vicinity of 103rd Street. It has been standard Park Department practice for many years to locate playground and recreational facilities which would be used by pre-school youngsters on the periphery of the parks so that they are readily and easily accessible for parents of such children. For example there are numerous playgrounds and other recreational facilities in Central Park which are located on Fifth Avenue.
“These requests were based on the fact that the present recreational facilities in the park are inadequate and are located at the lower level of the park adjacent to Henry Hudson Parkway. These citizens and groups complained that it was quite difficult for mothers with babies in carriages to descend from Riverside Drive to the lower level of the park and in turn to ascend with carriages to Riverside Drive after using the facilities located at the lower level. There are no recreational facilities at the upper level because of the sloping terrain.”
*278 He concluded: ‘ ‘ It is my judgment that the new facility will make the recreation area more accessible to the mothers of small children in the neighborhood as well as teenage and golden age groups and thus help the utilization of the park area.” (par. 15.) The exhibits to the affidavits show that the requisite approvals of the Municipal Art Commission and the Department of Buildings and Housing were obtained.
Thereafter, the donors donated $600,924. The city appropriated $90,000 in the 1963-64 capital budget and $410,000 in the 1964-65 capital budget, making a total of $500,000.
Advertisements for bids followed. The aggregate of the lowest bid amounted to $1,200,457. This was $99,533 in excess of the amounts available from the private donations and the capital budget appropriations.
By Certificate CBX-3736, Mayor Wagner authorized Commissioner Morris to enter into contracts with the lowest bidders. That certificate provided that the deficit of $99,533 would be made good by “ funds from whatever source the Comptroller deems appropriate, said source to be reimbursed at a later date by approval of the Mayor of the amendment of this approval so as to charge said cost to an amount to be approved by the Mayor subsequent to certification by the Mayor to the Comptroller of the amount to be used for financing said project under a future Capital Budget; and the Director of the Budget is authorized to approve addenda.”
The capital Budget for the year 1966-67 was finally adopted on March 15, 1966. This included Project No. P-491, which appropriates $99,533 in order to reimburse the Comptroller for funds advanced in connection with the recreational facility in Riverside Park. Pursuant to section 222 of the New York City Charter, this item has therefore been adopted.
Plaintiff’s attack on the feasibility and desirability of the proposed recreational area need not detain us. It is well settled that such matters of judgment are confided to the determination of the duly elected or appointed city officials. 795 Fifth Ave. Corp. v. City of New York (15 N Y 2d 221) sustaining the legality of the proposed construction of the Hartford Pavilion, a cafe and restaurant at the southeast corner of Central Park. “Judicial interference with local municipal decisions by public officials in a situation of this kind is justified only when ‘ a total lack of power ’ is shown, as this court observed in Kaskel [v. Impellitteri, 306 N. Y. 73, 79]. * * * What plaintiffs did establish on the trial was a difference of opinion among some experts, in park management and a divergence of view among others interested in a proper and appropriate utilization of Central *279 Park about how the proposed pavilion would harmonize with the dominant purposes of this noted public recreational facility. * * * The proof demonstrates adequate power in the Park Commissioner and the Board of Estimate to accept or reject this restaurant proposal. If that power in the appropriate city officials exists, and we can entertain no doubt on this record that it does exist, the court’s inquiry upon the complaint of a citizen who differs with the city reaches the end of its course ” (pp. 225-226, per Bergan, J.).
It is true that, in that case, a full trial was held on the issue at Special Term. (40 Misc 2d 183.) That was because the Appellate Division had previously held, in granting leave to amend the complaint, that “facts should be pleaded which set forth why the restaurant contemplated is ‘ of a sort not constituting a valid park use ’; why its erection ‘ would be contrary to the purposes and trusts upon which said park was acquired and erected ’, and why the restaurant would be an unlawful encroachment upon Central Park.’ ” (13 A D 2d 733, 734.)
That has no application to the instant case. A recreational facility is a conventional and accepted attribute of a park, and the determination as to feasibility and desirability of this particular recreational facility is left to the city officials.
That applies even though this is an indoor recreational facility in a building designed for that purpose. As Commissioner Morris’ affidavit shows (par. 9), the proposed building “is similar in size and proposed use to that of at least eight other park facilities which are now maintained in New York City parks and which are used by the community in ever-increasing numbers for recreation, relaxation and enjoyment. As recently as November 10, 1965, a similar facility for golden age groups was established in Sara Delano Boosevelt Park in the lower east side of Manhattan. Moreover there are 11 large buildings now maintained in New York City parks which are utilized in conjunction with adjacent outdoor swimming pools during four months of each year. During the remaining eight months these facilities are used as community recreation centers for preschool, teenage, and golden age groups. The obvious advantage of such a facility is that it permits recreational activities to be maintained on a year-round basis despite rain, cold or other inclement weather.”
‘ Monuments and buildings of architectural pretension which attract the eye and divert the mind of the visitor; floral and horticultural displays, zoological gardens, playing grounds, and even restaurants and rest houses and many other common incidents of a pleasure ground contribute to the use and enjoyment *280 of the park. The end of all such embellishments and conveniences is substantially the same public good. They facilitate free public means of pleasure, recreation and amusement and thus provide for the welfare of the community” (Pound, J., in Williams v. Gallatin, 229 N. Y. 248, 253-254).
The procedure in connection with the award of contracts presents a more difficult question.
It has been well settled, since the decision in 1907 in Williams v. City of New York (118 App. Div. 756 [1st Dept.], affd. 192 N. Y. 541), that a contract is invalid if made in excess of the previous budgetary appropriation therefor, and that the invalidity is not cured by a subsequent appropriation to cover the deficit. The city urges that the decision in Williams was dictum. However, I do not read it that way. The principle was expressly reaffirmed in People ex rel. Carlin Constr. Co. v. Prendergast (220 N. Y. 725) and in People ex rel. Conners v. Board of Educ. of City of N. Y. (197 App. Div. 5,11 [1st Dept.]).
In Williams v. City of New York (supra) the Board of Estimate and Apportionment and the Board of Aldermen had authorized an issue of corporate stock to an amount not exceeding $39,000 to provide a dormitory for the employees of the Board of Trustees of Bellevue and Allied Hospitals. Plaintiffs’ bid amounted to $48,996. Their bid was rejected because of the insufficiency of the appropriation. The next day, the Board of Aldermen approved an additional appropriation of $14,000 which had theretofore been approved by the Board of Estimate and Apportionment.
Plaintiffs sued for damages for breach of contract. In denying recovery, the court pointed out the evils which might follow from validating a bid in excess of an amount previously authorized by a subsequent appropriation. The court said, per Clarke, J. (118 App. Div. 756, 762-763):
“ The board of trustees [of the hospitals] could not validate a bid in excess of the amount previously authorized. The bid was invalid when made and no subsequent action by that board or by any other board could breathe into it the breath of Ufe. If the positive inhibition of the statute can be so evaded, if the city government should hereafter fall into the hands of careless or unscrupulous officials, an easy way would be provided for collusive bids under a small appropriation and a subsequent enlargement thereof in fraud of possible bidders and great loss to the city. The strict provisions of the Consolidation Act, re-enacted in the charter, were the outgrowth of the experiences of the city a little over a generation ago when its finances were unblushingly and almost openly looted by a conspiracy between *281 public officials and their favored contractors. What has once happened may be repeated.
‘ ‘ While in the case at bar there is no suggestion of fraud or impropriety, good motives in the particular case furnish no grounds for weakening the defenses against possible fraud. * # #
‘ ‘ Previous appropriation is essential to the validity of a contract for public work to be paid for by the public funds under the provisions of the charter ” (italics supplied).
The city urges Seif v. City of Long Beach (286 N. Y. 382), as authority for the fact that a subsequent appropriation may “ratify” the defect in the original appropriation. In that case, the court reversed a judgment for legal services recovered by an attorney who had been retained by the Mayor to represent the city in certain litigation, because the City Council had refused to confirm the retainer. In a dictum, Chief Judge Lehman said (pp. 386-387): “ The City Council, having authority to authorise appointment of Special Council, could, by its ratification, give validity to the retainer by the Mayor, though such retainer was unauthorized and invalid when made. Ratification by a municipal corporation, like ratification by a private corporation or by an individual, ‘ may be by express assent, or by acts or conduct of the principal, inconsistent with any other supposition than that he intended to adopt and own the act done in his name. ’ (Peterson v. Mayor, 17 N. Y. 449, 453.) The opinion, written by Judge Dentio, in that case sets forth the rule, applicable to municipal as well as private corporations : ‘ Chancellor Kent says, the doctrine that corporations can be bound, by implied contracts, to be deduced by inference from corporate acts, without either a vote or deed or writing, is generally established in this country with great clearness and solidity of argument.’ (Citing cases.) In enunciating that rule, Judge Denio, however, took care to point out the limits of its application. For instance, no sort of ratification can make good an act without the scope of the corporate authority. So where the charter or a statute binding upon the corporation, has committed a class of acts to particular officers or agents, other than the general governing body, or where it has prescribed certain formalities as conditions to the performance of any description of corporate business, the proper functionaries must act, and the designated forms must be observed, and generally no act of recognition can supply a defect in these respects ’ (p. 454).” (Italics supplied.)
The essential distinction is that, in that case, the City Council had authority to appoint special counsel, while in the instant *282 case, the charter prohibits the city authorities from entering into a contract in the absence of a prior appropriation therefor. This rule is a salutary one for the reasons stated in Williams v. City of New York (supra) which does not apply to a situation where city authorities retain counsel or other employees for a specific purpose.
The city also urges section 225 of the City Charter, which authorizes the Mayor to increase an appropriation in the capital budget by 15%. (See Paduano v. City of New York (45 Misc 2d 718, 722-723, affd. on opinion below, 24 A D 2d 437.) The argument is that, under this authority, Mayor Wagner could have added $75,000 to the appropriation.
The short answer is that Mayor Wagner did not do so. The authority under section 225 must be actually exercised by the Mayor himself taking the responsibility, and not authorizing the Comptroller to borrow the sum from a future capital budget appropriation. -It should also be noted that the deficiency in the appropriation was not $75,000, but $99,533.
The motion to dismiss the complaint is denied. The motion for an injunction pendente lite is granted, without prejudice to the right of the city to readvertise for bids and to award the contracts if the bids fall within the amount covered by the present appropriation. The amount of the bond to be furnished by plaintiff will be fixed in the order to be settled hereon. The court invites comments from the parties as to the proper amount thereof.