Carmaw F. Ball, J.
There are three applications before the court: (1) plaintiff’s motion for a temporary injunction; (2) summary judgment for a permanent injunction; (3) defendants’ cross motion for summary judgment dismissing plaintiff’s complaint.
This is an action by a taxpayer of the City of Buffalo under section 51 of the General Municipal Law to enjoin or annul a series of legislative enactments of the Common Council of the City of Buffalo as supported by the actions and judgments of the administrative and executive branches of city government including the Mayor, Comptroller, Corporation Counsel and the Commissioner of Public Works involving their determinations as to the merits of the expansion and the renovation of Memorial Auditorium for the purpose of improving the facility and bringing a major league franchise in the National Hockey League to Buffalo.
1. On January 13,1970 the Common Council delegated authority to the Corporation Counsel to negotiate a lease for Memorial Auditorium with Niagara Frontier Hockey Corporation.
2. On January 27,1970 the Common Council approved a draft lease then on file before the council but granted authority to the Corporation Counsel to modify and alter the terms and provisions of the lease “ without substantially altering the dollars and cents thereof.”
*145 3. During this time, architects, engineers and professional estimators retained by or in the employ of the City of Buffalo compiled an estimate of the sum of $6,200,000 as the amount necessary to complete that portion of the work then contemplated for Memorial Auditorium. The authority of the Commissioner of Public Works to employ the architects was confirmed by the Common Council by resolution on January 27, 1970.
4. On January 27, 1970, upon receipt of a certificate of necessity executed by the Mayor and Comptroller, the Common Council passed a resolution increasing the capital funds budget of the city for the current fiscal year in the amount of $6,200,000 for the reconstruction of Memorial Auditorium.
5. On February 10, 1970 the Common Council passed a resolution authorizing test borings to be made at the Auditorium site.
6. On February 11, 1970, negotiations between the Niagara Frontier Hockey Corporation and the City of Buffalo had finally been completed, and with the approval of the Corporation Counsel, a lease was signed on condition that the bids would be within $6,200,000 bond issue as directed by the Common Council, on behalf of the City by the Chairman of the Board of Stadium and Memorial Auditorium and by a representative of the Niagara Frontier Hockey Corporation.
7. On February 24, 1970, the Common Council approved a bond issue aggregating $6,200,000 ‘1 for the purpose of raising money for the reconstruction in part of the Memorial Auditorium ”, and stating further that “ it is estimated that the maximum cost of the specific object or purpose for which said notes and bonds are to be issued, as determined in the 1969-1970 Capital Budget duly adopted and amended by this Common Council, is Six Million Two Hundred Thousand Dollars ($6,200,000).”
8. On March 5, 1970 bids were published. On March 19, 1970, the bids for the auditorium work, including a number of alternates, were received and exceeded the sum of $6,200,000:
9. On April 2, 1970 negotiations between representatives of Niagara Frontier Hockey Corporation and the Common Council and officials of the City concerning the total cost of the auditorium project and the amendments to the Niagara Frontier Hockey Corporation lease, the Common Council again approved the lease executed on February 11, 1970,, but modified it in part with certain technical changes in language and a substantial increase in admission rentals to the city.
*146 10. On the same date, the Common Council resolved: “ That work for the enlargment of the Buffalo Memorial Auditorium he and the same is hereby ordered in strict compliance with the plans and specifications from the aforementioned lowest responsible bidders as reported and certified by the Commissioner of Public Works by his communication to the Council dated March 19, 1970, at a total cost of $8,039,683.80 and that said cost be charged to the proper bond fund in the Division of Buildings as funds from time to time become available.”
11. At the special meeting of the Common Council on April 24, 1970, the Common Council received and filed the certificate of necessity required by the City Charter prior to the Common Council increasing the capital program in the City of Buffalo and on the same date the Common Council considered a resolution increasing the capital program in the amount of $2,500,000 for the reconstruction of Memorial Auditorium was passed. The Common Council then considered the bond resolution in the sum of $2,500,000 to implement the addition to the capital improvement program. This bond resolution was duly tabled as required under the Common Council Bules and the council may act favorably at its next meeting on May 5, 1970 at 2:00 p.m. The action of the Common Council was done to comply with its resolution of April 2, 1970 which would eventually make available funds totaling $8,700,000 sufficient to complete the reconstruction of Memorial Auditorium in accordance with the bids submitted and approved by the Common Council.
The 'Complaint sets forth four causes of action based upon' claims of illegality and/or waste as follows:
(1) That the city has improperly committed itself to the payment of sums in excess of the amount authorized in the bond resolution of February 24, 1970 and, in so doing has thwarted the right to petition for a referendum ;
(2) That the city without authority has or is about to enter into contracts calling for expenditures in excess of the amount authorized by the bond resolution;
(3) That the auditorium lease between the City of Buffalo and the Niagara Frontier Hockey Corporation violates section 23 (subd. 2, par. b) of the General City Law; and
(4) That the enlargement of Memorial Auditorium and the lease agreement with the Niagara Frontier Hockey Corporation are improvident and wasteful.
The plaintiff contends in his first and second causes of action that the $6,200,000 bond issue of February 24, 1970 became. invalid when the bids were received on March 19, 1970 because they were in excess of the bond issue and, therefore, violated sec-, *147 tion 32.00 of the Local Finance Law. That section requires that the bond issue shall contain “ the estimated maximum cost ”.
In support of their position, the plaintiff cites various State Comptroller opinions to the effect that section 32.00 of the Local Finance Law prevents a municipality from expending an amount in excess of that estimated to be required for a capital project in the bond resolution previously approved by the voters. In each of these opinions, unlike this case, the Comptroller was concerned with municipal bodies whose capital fund projects could only be authorized and financed by mandatory prior voter referendum in accordance with the particular town and village law. They do not pertain to the factual situation here presented.
The plaintiff,' in its memorandum, cites the case of Davis v. City of New York (50 Misc 2d 275) and Williams v. City of New York (118 App. Div. 756, affd. 192 N. Y. 541).
These cases are distinguishable from the facts before us. The Williams ease held that a New York City department head or official could not commit the city to more funds than those authorized by a legislative body. The Davis case held that the Charter provisions in section 225 restricted the amount of increase of the capital budget. Here, the legislative body, the Common Council of the City of Buffalo, has the power to authorize the contract and has the power to increase the capital fund appropriation and authorize a supplemental bond issue.
Plaintiff further contends that the resolution of the Common Council of April 2, 1970 authorizing the city to go ahead with the expansion of the auditorium in the sum of $8,700,000' is illegal in that it would prevent the citizens of an opportunity to demand a referendum pursuant to section 412-a of the City Charter, and further, that the city is without the power to let or execute any contracts for the project until the city has passed a supplemental bond issue and complied with the time requirements of the City Charter to permit a permissive referendum. The petitioner’s premise is wrong. The city has not contracted to expend any funds in excess of the amount appropriated and cannot do so unless the Comptroller complies with section 401 of the City Charter which provides: “No contract hereafter made, the expense of the execution of which is not, in whole or in part, to be paid by local assessment, shall he binding or of any force unless the comptroller shall endorse thereon his certificate that there remains unexpended and unapplied a balance of the appropriation or fund applicable thereto sufficient to pay the expense of executing such contract as appears upon the face thereof.” (Emphasis added.)
*148 The Comptroller has not made any such indorsement or executed such certificate.
Section 31.00 (subd. b) of the Local Finance Law permits the issuance of one or more bond resolutions for a given project. Section 32.00 of the Local Finance Law also contemplates the cost may exceed the original estimates and acknowledges the legality of issuing one or more bond resolutions for a specific project or purpose.
Section 31.00 (subd. b) of the Local Finance Law provides: 1 ‘ Any municipality, school district or district corporation may adopt one or more bond resolutions or capital note resolutions authorizing the issuance of bonds or capital notes for a specific object or purpose, for which object or purpose serial bonds may be issued. In addition thereto any municipality or city school district may adopt one or more bond resolutions or capital note resolutions authorizing the issuance of bonds or capital notes for any class of objects or purposes, for which objects or purposes serial bonds may be issued.” (Emphasis supplied.)
The Third Report of the Temporary State Commission for the Revision and Codification of the Laws Relating to Municipal Finance (N. T. Legis. Doc., 1942, No. 61, p. 13) stated: “ Finally, the confusion as to the relationship of the requirements specified for the contents of a bond resolution and the present methods of financing capital improvements has been clarified. Such requirements do not prevent the adoption of a single resolution and the issuance of bonds from time to time thereunder for a particular improvement or the adoption of several bond resolutions for the financing of several different phases of a particular improvement. Further, under such requirements, the appropriation for a capital improvement may be made concomitant with or prior or subsequent to the adoption of a bond resolution therefor, depending upon the practice of the local unit.” (Emphasis added.)
Section 359 of the Charter of the City of Buffalo provides specific authority for the city to act to increase its indebtedness for a given capital improvement project.
Here, when the bids exceeded the original estimate, the Common Council reconsidered the project, renegotiated the lease so as to increase its income and resolved to go ahead.
On the question of whether officials of the City of Buffalo may accept bids which were heretofore received in an amount in excess of the authorized expenditure when and if sufficient funds were made available without advertising for new bids, this court finds no statute or decision dealing with the subject nor has any of the parties submitted any authority. In the absence of a show *149 ing of bad faith or fraud by the city officials of Buffalo, the court finds that it is a matter of legislative discretion to accept such low bids.
The Common Council of the City of Buffalo, faced with the situation where it appears that the granting of a hockey franchise from the National Hockey League was dependent upon their acting within a minimum amount of time in order to have the auditorium available for the 1970-71 hockey season, have by their resolution of April 2, 1970 determined to go forward and accept the bids of the lowest bidder received on March 19, 1970. It has implemented its desire by calling a special meeting on April 24, 1970 and presenting a supplemental bond issue of $2,500,000.
Under the rules of the Common Council this motion was tabled until May 5,1970, at which time it is expected an affirmative vote will pass the bond resolution.
If the Council of the City of Buffalo passes the supplemental bond resolution, the citizens of Buffalo will have all of the rights that presently exist under section 412-a of the City Charter to petition for a referendum. Until this occurs, the Comptroller of the City of Buffalo will not be able, under his oath of office, to certify the availability of funds. Therefore, the City of Buffalo, under the Charter provision as argued before this court, cannot enter into any contract for the expenditure of funds for the enlarging of the Memorial Auditorium until the supplemental bond is effective.
When the elected officials in both the legislative and executive branches of the city government have in good faith fully considered the auditorium project and the voters retain the right to have a referendum on the future bond issue authorized April 24, 1970, there is no substance to plaintiff’s contention that the taxpayers have been deprived or will be deprived of their .right to demand a referendum.
Plaintiff in his third cause of action alleges that the lease agreement between the City of Buffalo and the Niagara Frontier Hockey Corporation violates section 23 (subd. 2, par. b) of the Greneral City Law in that there was no public bidding.
The section requires that leases of the city real estate be made only at public auction to the highest bidder followed by a three-fourths vote of approval of the Common Council. This court agrees with Supreme Court Justice Joseph Kitszykski’s unreported decision of December 22, 1969, in which he stated in deciding the same question:
“ The competitive bidding requirements of Section 23, 2 (b) of the General City Law do not apply to the City of Buffalo with *150 respect to concession rights at the Memorial Auditorium. This section * * * contained this exception when it was enacted by the State Legislature in 1913. [Emphasis supplied.]
(Chapter 247, Laws 1913.)
‘1 ‘ The foregoing limitations shall not apply to the exercise by any city of any power now vested in it,... ’
“ The City of Buffalo one year earlier by specific legislation which related only to its authority, received broad unrestricted power from the State Legislature to sell or lease city real property or franchises, and also to enact ordinances regulating its use. (Chapter 146, Laws 1912.)
‘ ‘ The City of Buffalo, therefore, had vested broad powers in 1913 when the restrictive Section 23 2 (b) of the General City Law was enacted and which by its very terms did not nullify or limit the specific power which any municipality then possessed.
“ These broad powers survived the revision of the Charter of the City of Buffalo in 1914 (Chapter 217, Laws 1914) and were continued by incorporation into Section 517 of the City Charter which was adooted by the electors of Buffalo on August 29,1927.”
The city’s power to lease already existed when the home-rule bill was passed in 1913 and the said power was not incumbered by any limitations removed by the said bill. (See Colonial Motor Coach Corp. v. City of Oswego, 126 Misc. 829, affd. 217 App. Div. 816, 220 App. Div. 809.)
Plaintiff alleges in his fourth cause of action that the enlargement of the auditorium and" also the lease agreement with the Niagara Frontier Hockey Corporation are injurious to and wasteful of property, funds and estate of the city.
Section 51 of the General Municipal Law permits a taxpayers ’ action (1) to prevent any illegal official act; or (2) to prevent waste or injury to, or to restore and make good any property, funds or estate of municipal corporation.
Plaintiff’s complaint is against the wisdom and desirability of going ahead with the auditorium project. There is no charge of fraud, collusion or bad faith.
As stated in Campbell v. City of New York (244 N. Y. 317, 328): “The courts do not sit in judgment upon questions of legislative policy or administrative discretion. The taxpayer must point to illegality or fraud ”.
In Stahl Soap Corp. v. City of New York (5 N Y 2d 200) at page 204, the court said: “Redress may only be had, however, when the official acts complained of are found to be corrupt, fraudulent or done in bad faith (McCutcheon v. Terminal Sta. Comm. [217 N. Y. 127]) or constitute a waste of public property *151 * # * 1 for entirely illegal purposes ’ (Emphasis added.)
(See, also, Kaskel v. Impellitteri, 306 N. Y. 73.)
As the court stated in Talcott v. City of Buffalo (125 N. Y. 280, 285, 286, 288): “ The complaint contains no charge that the action of the authorities was fraudulent or corrupt, or that any dishonest or unlawful end was in view, or was sought to be accomplished. The most that can fairly be said to be charged in the complaint is that the authorities of the city are using the power conferred by the charter unwisely and without due regard to economy. The question for our determination in this case, therefore, is whether a taxpayer can maintain an action to restrain the governing body in a city from official action, within its power and discretion and without any charge or allegation of fraud, collusion, corruption or bad faith.”
In Ziegler v. Chapin (126 N. Y. 342) the court rejected a contention by a taxpayer that poor judgment on the part of public officials would justify judicial intervention when it said:
‘ ‘ jurisdiction in the officials existing, the courts can interfere in actions like that before us only where some fraud or collusion or bad faith is alleged and proved.
t< # # * was not intended as a mode of putting an incapable or confiding official under the protecting guardianship of the court and of making him a ward in chancery tobe shielded from the effects of his own folly, nor to enable a taxpayer to try a question of fraud between the officer and those who are dealing with him. * * * but manifestly did intend to give the latter protection against the dishonesty or fraud of the municipal agents.” (pp. 348-349; emphasis supplied.) (See, also, People ex rel. Wood v. Draper, 15 N. Y. 532, 545.)
Essentially plaintiff’s contentions are that the officials of the City of Buffalo are using poor judgment in entering into the lease and auditorium reconstruction.
Against the backdrop of Nationwide publicity and the enormous local interest occasioned by the City of Buffalo’s acceptance into the National Hockey League, the news media of all kinds have kept the negotiations for the lease, the planned expansion, the authorized bond issues, the advertising and receiving of bids and all of the proceedings of the Common Council in the local spotlight. This court is satisfied that the lease negotiations and the planned expansion have all been done without collusion and in good faith.
The plaintiff further alleges and the city admits that the general contractor has commenced certain preliminary construction work while there is no contract. Obviously, a contractor who would proceed with preliminary construction without a contract *152 must do so at Ms own peril. However, tMs court is satisfied that permission to do preliminary work on the auditorium is a legislative matter, not one for this court.
Plaintiff’s motion for an injunction and summary judgment is denied.
Defendants’ motion for summary judgment dismissing the plaintiff’s complaint is granted.